# Richmond.

WILLIS AND OTHERS v. KALMBACH AND OTHERS.

March 18, 1909.

1. CONSTITUTIONAL LAW—*Legislative Powers of General Assembly.*—
   As to matters not ceded to the Federal Government, the legis-
   lative powers of the General Assembly are without limit, ex-
   cept so far as restrictions are imposed by the Constitution of
   the State in express terms or by strong implication. The State
   Constitution is a restraining instrument only, and every pre-
   sumption is made in favor of a State statute.

2. CONSTITUTIONAL LAW—*Statutes—Validity—Construction.*—While the
   courts have the power, and in a proper case it is their duty, to
   declare a statute unconstitutional, it is a duty of the utmost
   delicacy. Every presumption is to be made in favor of the
   constitutionality of a statute, and it can never be declared un-
   constitutional except where it is *clearly* and plainly so. To
   doubt is to affirm constitutionality. There is no such thing as
   a doubtful constitutional statute.

3. INTERPRETATION OF WRITINGS — *Words — Harmonizing Whole.*— In
   the interpretation of all writings words must be construed with
   reference to their plain and ordinary meaning, and, if possible,
   every word must be given its due force and effect, but at the
   same time each part of the writing must be construed with
   reference to every other part, so as to make it harmonious and
   sensible as a whole, if possible.

4. CONSTITUTIONAL LAW—*Office of Schedule.*—The office of a schedule
   to a Constitution, as a general rule, is to provide for a transition
   from the old to the new government, and to obviate incon-
   veniences which would otherwise arise from such transition,
   and not to introduce independent and substantive provisions of
   law into the Constitution, though the latter may be done if the
   purpose to do so plainly appears.

5. CONSTITUTIONAL LAW—*Elections—Qualification of Electors—Special
   Elections—Ward Act.*—In view of the foregoing rules of inter-
   pretation, the policy of the State from the foundation of the

government until now of permitting the legislature to fix the
electorate for all special elections except for officers elective by
the people, and the construction placed upon similar provisions
of the Consitutions of other States of the Union, the language
of section eighteen of the schedule to the Constitution of 1902,
"in all elections held after this Constitution goes into effect,
the qualifications of electors shall be those required by article
II of this Constitution," is applicable only to elections provided
for by the Constitution and schedule, and not to other elections
which the legislature may see fit to order. As to the latter,
the legislature has the power to fix the electorate. Hence the
act approved February 25, 1908 (Acts 1908, p. 83), commonly
known as the Ward Act, prescribing the qualification of voters
in special and local option elections, in so far as it affects elec-
tions not provided for by the Constitution and schedule is a
valid exercise of legislative power.

6. CONSTITUTIONAL LAW—*Statutes—Operation—Subsequent    Approval
Local Option Laws.*—When not restrained by the Constitution,
in express terms or by necessary implication, the legislature has
the power to make the operation of a statute dependent upon
a vote of the people thereafter to be taken. In this State there
is no constitutional inhibition on the power of the legislature
to pass local option laws.

Error to a judgment of the Corporation Court of the city of
Fredericksburg in a contested election case. To a judgment
setting aside the election, the contestees assign error.

*Reversed.*

The opinion states the case.

*Wm. H. Mann, R. E. Byrd, F. M. Chichester* and *B. P.
Willis,* for the plaintiffs in error.

*St. George R. Fitzhugh, Alvin T. Embrey* and *C. O'Conor
Goolrick,* for the defendants in error.

KEITH, P., delivered the opinion of the court.

Upon the petition of the requisite number of persons, an
election was ordered by the Corporation Court of the city of

Fredericksburg, to take place on the 5th day of May, 1908, upon the question "for licensing" or "against licensing" the sale of intoxicating liquors within the limits of the said city. At the election held in obedience to this order, 351 ballots were cast against and 320 in favor of licensing.

On May. 14, 1908, a petition, signed by 24 persons was filed, praying that, the election be declared illegal, null and void, upon the following grounds:

"(1) Because the persons petitioning for the election had not paid their poll taxes as required by law six months prior to the presentation of the said petition to the Corporation Court of Fredericksburg, and none of them were exempt from the payment of capitation taxes as a prerequisite to voting, and hence none of them were qualified voters authorized to sign said petition.

"(2) Because about 80 *per cent.* of the persons voting at the election were not qualified voters, none of them having paid their poll tax six months prior to the date of the election, they not being exempt from such payment.

"(3) Because the act of the General Assembly approved February 25, 1908, known as the Ward Act (Acts 1908, p. 83), is unconstitutional and void, inasmuch as the said act provides that at any local option election held on or before the second Tuesday in June any person shall be qualified to vote who is otherwise qualified to vote and has personally paid, at least six months prior to the second Tuesday in June of that year, all State poll taxes assessed or assessable against him during the three years next preceding that in. which such special or local option election is held."

A number of citizens who had voted against license were made parties defendant, and filed their answer, denying all the material allegations of the petition; and the case coming on to be heard upon the petition, the answer and the testimony of witnesses, an order was entered holding the Ward Act passed February 25, 1908, to be in plain conflict with the Constitution

of Virginia, and that the election held on May 5, 1908, was null and void.

To that judgment a writ of error was allowed by this court.

The only question insisted upon in the argument before us, and the only one which we shall consider, is as to the constitutionality of the act of assembly approved February 25, 1908, and commonly known as the Ward Act (Acts 1908, p. 83).

Counsel for plaintiffs in error have warned us of the evils which must flow from an affirmance of the judgment of which they complain, while counsel for defendants in error forebode consequences no less mischievous should the judgment be reversed. In this dilemma, we cannot do better than to concede that the case is one of grave importance, and that any conclusion we may reach will be attended by serious results to the interests involved.

To pass upon the power of the legislature and determine whether a statute which it has enacted is a valid exercise of its power, or is to be deemed null and void on account of its repugnancy to the Constitution, is a duty of the utmost delicacy. From the earliest exercise of this power by the courts, down to the latest expression upon the subject, they have with one voice declared, that while the power was essential in a government in which the people, who are the source of all power, have seen fit to restrain the various governmental agencies, which they have established, by an organic act or Constitution emanating directly from themselves, nothing short of a plain and palpable repuganancy to the Constitution of the statute whose validity is called in question can warrant a court in holding a statute to be null and void.

Another principle of equal authority is that "as to matters not ceded to the Federal government, the legislative powers of the General Assembly are without limit, except so far as restrictions are imposed by the Constitution of the State in express terms, or by strong implication. The State Constitution is a restraining instrument only, and every presumption is made

in favor of the constitutionality of a State statute. No stronger presumption is known to the law. In order to warrant the courts to declare a State statute unconstitutional, the infraction must be clear and palpable." *Whitlock* v. *Hawkins,* 105 Va. 242, 53 S. E. 401.

As is said in *Prison Association of Virginia* v. *Ashby,* 93 Va. 667, 25 S. E. 893, "the legislature of the State has plenary legislative power, except where it is restricted by the Constitution of the State, or of the United States, and the courts have no power to declare its acts invalid merely because they regard the legislation as unwise or vicious."

And in *Button* v. *State Corporation Commission,* 105 Va. 634, 54 S. E. 769, it is said that acts of the legislature "are always presumed to be constitutional, and can never be declared otherwise, except where they clearly and plainly violate the Constitution. All doubts are resolved in favor of their validity, and, in resolving doubts, the legislative construction put upon the Constitution is entitled to great consideration, though it will not be given a controlling effect." See also *Eyre* v. *Jacob,* 14 Gratt. 422, 73 Am. Dec. 367.

The principles enunciated in these decisions are fully recognized and firmly established.

By article II, section 18 of the Constitution, it is provided, that "every male citizen of the United States, twenty-one years of age, who has been a resident of the State two years, of the county, city, or town one year, and of the precinct in which he offers to vote, thirty days, next preceding the election in which he offers to vote, has been registered, and has paid his State poll taxes, as hereinafter required, shall be entitled to vote for members of the General Assembly and all officers elective by the people;    *    *    *."

The remaining sections of that article merely serve to provide the means by which the voter may be secured in the exercise of his right, and the public may be protected against fraudulent and illegal voting.

This article prescribes the qualifications for voters for members of the General Assembly and all officers elective by the people; that and none other is its purpose and extent.

It will be well to consider the suffrage provisions of former Constitutions of this Commonwealth.

In the Constitution of 1776, it was provided, that "the right of suffrage in the election of members to both houses shall remain as exercised at present;" and turning to Henning's Statutes at Large, Vol. 8, at p. 306, we find, that "every person shall have a right to vote at any election of burgesses, for any county, who hath an estate of freehold for his own life or the life of another or other greater estate" in land as therein prescribed; thus incorporating into the Constitution the right of suffrage as it was at that time exercised by virtue of the statute law.

By the Constitution of 1830, "every white male citizen resident therein, aged 21 years and upwards being qualified to exercise the right of suffrage according to the former Constitution and laws, and every such citizen being possessed or whose tenant for years or at will or at sufferance, is possessed of an estate of freehold of the value of $25 * * * shall be qualified to vote for members of the General Assembly."

Under the Constitution of 1850, "every white male citizen of the Commonwealth who has been a resident of the State for two years, and of the county, city or town where he offers to vote for twelve months next preceding an election—and no other person—shall be qualified to vote for members of the General Assembly and of all officers elective by the people."

A similar provision occurs in the Alexandria Constitution of 1864; and by that of 1869, known as the Underwood Constitution, "every male citizen of the United States who shall have been a resident of this State twelve months and of the county, city or town in which he shall offer to vote three months next preceding the election shall be entitled to vote upon all questions submitted to the people at such election."

It is to be observed that down to 1850, the qualification of

voters applied only to the election of members of the General
Assembly. At that time, however, the number of officers to be
chosen by direct vote of the people was greatly increased, and
provision was then made, that the electorate created by the
Constitution should be qualified to vote for members of the
General Assembly and for *all officers elective by the people.*
It is a striking circumstance that the Constitution of 1869,
provided that the electorate which it created should be "enti-
tled to vote upon *all questions submitted to the people at such
election,*" and that within seven years after its adoption that
Constitution was amended and the language of the Constitution
of 1850 upon this subject was restored.

We think it plain that if the question before us were to be
determined by reference to the second article of the Consti-
tution, there could be no doubt that the legislature, following
the precedents that had been established from the foundation of
our government, would have had the right to prescribe the
qualifications of voters at all elections except those for members
of the General Assembly and officers elective by the people, the
only elections which are mentioned or referred to in that article,
or indeed in any part of the Constitution until we come to the
schedule, the effect of which we shall now consider.

The 18th section of the schedule provides, that "in all elec-
tions held after this Constitution goes into effect, the qualifica-
tions of electors shall be those required by article two of this
Constitution;" and the contention is that the phrase "all elec-
tions" embraces not only all elections provided for by the Con-
stitution, but elections of every kind and description—that it
fastens itself upon, regulates, and controls the power of the
legislature with respect to all elections which it may see fit to
order, and confines the electorate to those having the qualifica-
tions required by article II of the Constitution.

It is true that in the interpretation of all writings words
must be construed with reference to their plain and ordinary
meaning, and, if possible, every word must be given its due

force and effect; but, in the effort to give the words their due force, we must not lose sight of other parts of the instrument, but each part must be construed with reference to the whole, so as to make it harmonious and sensible as a whole.

As was said by Judge Moncure in *The Richmond Mayorality Case,* 19 Gratt. at p. 712, "the office of a schedule is to provide for a transition from the old to the new government, and to obviate inconveniences which would otherwise arise from such transition." Elsewhere in the same opinion it is said, that "if a convention, in framing the schedule, should plainly show an intention to place any of its provisions beyond the control of the legislature, such provisions, being the act of the representatives of the sovereignty of the State without any constitutional restrictions, would be as effectual and binding as if they were embodied in the Constitution itself."

The general principle, however, is that the office of a schedule, as this schedule discloses, is not to cure defects or provide for omissions in the Constitution; not to introduce new and substantive provisions into the Constitution—there was no occasion for that. The whole subject, the entire instrument, was within the breast of the convention and subject in all its parts to be altered and amended as to the convention seemed best. Is it to be supposed that under such circumstances a provision which was to limit the power of the legislature over a numerous and important class of subjects, a power which had existed in and been exercised by all preceding legislatures, would have been postponed to the schedule? To do so would be to suggest doubt and to invite controversy, when, if such was the purpose of the convention, it could have been placed beyond the pale of question or debate by its insertion where it properly belonged.

But it is urged upon us that the convention was called and the Constitution was adopted in order to purge the electorate of ignorant and undesirable voters, and that unless all elections of whatever description are to be confided to the electorate thus established, the convention to that extent fell short of discharging its duty.

We have seen that in the several Constitutions of this State, down to that of 1869, and under it after the amendment of 1876, the General Assembly, without question in numerous instances and in furtherance of various objects, exercised its power and discretion in submitting questions to an electorate of its own choosing, with qualifications different from those prescribed by the Constitution. We have seen that the Constitution of 1869 provided in express terms that the electorate which it established should vote "upon all questions submitted to the people;" and we have seen that this provision was stricken out, and the phrase "for members of the General Assembly and all officers elective by the people," was inserted, thereby bringing the Constitution of 1869 into harmony with the long established policy of the Commonwealth.

This circumstance seems to us to be one of the utmost importance. From 1776 to 1869 the power had been exercised by the General Assembly, when dealing with elections not provided for in the Constitution, to prescribe the qualifications for an electorate as to such elections. By the Constitution of 1869 this power was taken away, and the people of Virginia, with their attention directed to the specific question, voted to strike this provision from the Constitution and restored the power to the General Assembly.

It is true that the convention of 1901 was assembled in order to purge the electorate of ignorant and undesirable voters. When the convention met the chief difficulty encountered in the performance of their duty was found in the limitations upon their power contained in the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

The object of the Fourteenth Amendment, so far as it bears upon the question before us, was to secure "the right to vote at any election for the choice of electors for president and vice-president of the United States, representatives in congress, the executive and judicial officers of a State, or the members of the legislature thereof."

The Fifteenth Amendment declares that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

We think that it may fairly be said that the Fifteenth Amendment is intended to secure the right of citizens to vote in the elections enumerated in the Fourteenth Amendment; that with respect to the right of suffrage the two amendments cover and embrace the same objects.

These amendments imposed the only limitations that existed upon the power of the convention to deal with the question of suffrage, and certainly the Fourteenth Amendment never contemplated an election such as we are now considering.

So far as the history of the times throws light upon the situation, there is nothing to suggest that any part of the evil with which the convention had to deal grew out of, or was in any degree referable to the improper exercise of the power which the legislature had theretofore possessed, to provide an electorate other than that created by the Constitution for the determination of elections for which the Constitution itself did not provide.

The exercise of the power having been the subject of no complaint, it may well be supposed that the convention felt that having purged the electorate by which the General Assembly was to be chosen, that body would be in the future entitled to the same confidence and respect which it had theretofore enjoyed.

It is said, however, that unless the construction contended for by defendants in error be given to the 18th section of the schedule, it would be meaningless and inoperative.

The schedule provided for convening the legislature within five days after the Constitution went into effect. The eighteenth section of the schedule provides, that in all elections held after the Constitution goes into effect the qualification of electors shall be those required by article II of the Constitution—that is,

with respect to all elections which were intended to be embraced by this section of the schedule all the requirements of article II should apply; not this or that section of article II, but article II as an entirety. Some of the sections of that article are not self-executing and require legislative action to render them operative. The schedule refers in terms to many, if not all, the elections, State, county and municipal provided for by the Constitution, and it is a reasonable construction of the 18th section of the schedule to make it apply either to all elections ordained by the Constitution, or to all such as are mentioned in the schedule itself, if any election provided for by the Constitution be omitted; or, to put it more accurately, is such a construction so manifestly contrary to, unwarranted by and so plainly at war with the Constitution that it must be condemned by the courts?

The word "all" is without doubt one of very comprehensive meaning, but the meaning to be given to it in any particular case must be determined by its context. It may have its broadest signification, or it may be limited in its meaning to all of a particular kind or class. This phrase "all elections" has been frequently construed by the courts of other States.

In *Birchmore* v. *State Board of Canvassers,* 76 S. C. 461, 59 S. E. 145, the Supreme Court of South Carolina held, that an election to determine whether or not intoxicating liquor may be sold in a precinct is within a constitutional provision that all elections shall be by ballot. This case is reported in 14 Lawyers' Reports Annotated (N. S.), on page 850, and is the subject of an elaborate note, in which it is said that the position of the court, that the phrase "all elections," as used in the Constitution, was sufficiently broad to include not only elections for the selection of officers, but also elections to determine any particular or special question which might be submitted to the electors, "seems to be contrary to the weight of authority, as the general rule appears to be that the words 'election' or 'all elections' imply merely elections for the selec-

tion of officers, and that elections for the decision of some stated proposition need not be conducted under the formal and prescribed rules for elections for the selection of officers." In support of this criticism many cases are cited.

In *Valverde* v. *Shattuck,* 19 Col. 104, 34 Pac. 947, 47 Am. St. Rep. 208, the Constitution in question provided, that "Every male person over the age of twenty-one years, possessing the following qualifications, shall be entitled to vote at all elections." The court said: "In our opinion the word 'elections' thus used does not have its general or comprehensive signification, including all acts of voting, choice, or selection without limitation, but is used in a more restricted political sense—as elections of public officers."

In *Graham* v. *Greenville,* 67 Tex. 62, 2 S. W. 742, article 503 of the revised statutes reads as follows: "Whenever a majority of the inhabitants qualified to vote for members of the State legislature of any territory adjoining the limits of any city accepting the provisions of this title, to the extent of one-half mile in width, shall vote in favor of becoming a part of said city, any three of them may make affidavit to the fact, to be filed before the mayor, who shall certify the same to the city council of said city." Under this law the court held that a petition signed by a majority of the qualified voters within a certain district was a sufficient vote to determine the question of annexation, although the Constitution said that in all elections by the people the vote should be by ballot; the court holding that this provision of the Constitution did not provide that the will of a limited number of people on any subject in which they might be interested should be ascertained in no other way than by ballot.

In *Porter* v. *Crock,* 126 Ala. 600, 28 South. 745, the Constitution provided that all elections by the people should be by ballot, and that the General Assembly should pass laws to regulate and govern elections in the State, and all such laws should be uniform throughout the State; and that no classes

of qualified voters should be excluded from participating in the elections. The legislature passed a law providing for an election to establish a county seat, which law required ballots to be numbered, and that the election be restricted to voters within the county. The court said that it might well be doubted whether the provisions of the article of the Constitution cited above did not relate exclusively to elections held to select public officers; but that it was unnecessary to decide that question, as the power to locate or change a county seat was exclusively in the legislature, and it could prescribe any method for selecting a location that it chose.

In *Pritchard* v. *Magoun,* 109 Iowa, 364, 80 N. W. 512, 46 L. R. A. 381, a statute contained the following provisions: "That in all elections to be held after November 1, 1892, in the State, for public officers (except those elected at school elections), the voting shall be by ballots, printed and distributed at public expense as hereinafter provided; and no other ballot shall be used." "The term 'city election' shall apply to any municipal election held in a city or incorporated town." The court held that the latter provision was not intended to apply to a special election, although held within the limits of a city, and the provisions, taken together, did not require that an election to decide the question of raising money to build a bridge should be by ballot.

And the same laws were held not to apply to a special election held for the purpose of raising money to support a railroad. *Bras.* v. *McConnell,* 114 Iowa, 402, 87 N. W. 290.

See also, *Buckner* v. *Gordon,* 81 Ky. 665; *Belles* v. *Burr,* 76 Mich. 1, 43 N. W. 24.

In *Hanna* v. *Young,* 84 Md. 179, 35 Atl. 674, 57 Am. St. Rep. 396, 34 L. R. A. 55, the Supreme Court of Maryland construed a provision of the Constitution of that State which reads as follows: "All elections shall be by ballot and every male citizen of the United States of the age of twenty-one years or upwards, who has been a resident of the State for one year,

and of the legislative district of Baltimore city, or of the county, which he may offer to vote, for six months next preceding the election, shall be entitled to vote, in the ward or election district in which he resides, at all elections hereafter to be held in the State." "It is contended," said the court, "that this section of the Constitution plainly comprehends and includes within its express terms all elections, whether State, Federal, county, or municipal. Yet there is but one municipality mentioned in this section of the organic law, and, in fact, Baltimore city is the only municipality mentioned *eo nomine* in any part of the Constitution. This court in *Smith* v. *Stephan,* 66 Md. 381, 7 Atl. 561, 10 Atl. 671, Mr. Justice Bryan, delivering the opinion of the court, said: 'It is sufficient to say that no municipal elections except those held in the city of Baltimore are within the terms or meaning of the Constitution.' Whilst the Constitution, article III, section 48, authorizes and empowers the General Assembly to create corporations for municipal purposes, it nowhere prohibits the legislature from imposing upon the qualified voters, residing within the corporate limits of a town, any reasonable restrictions it may deem proper, when seeking the exercise of the right of elective franchise in the selection of its officers. In this respect the power of the legislature is unlimited."

The contention before the Maryland court was, as here, that the act in question was void because the Constitution had conferred the right and prescribed the qualifications of electors at all elections, and the legislature was, therefore, without authority to change or add to them in any manner. Speaking to this proposition, the court said: "The Constitution of this State provides for the creation of certain offices, State and county, which are filled, either by election or by appointment; and we regard it as an unreasonable inference to suppose that municipal elections, held within the State (outside the corporate limits of Baltimore city), can be properly termed elections under the Constitution, such as State and county elections; or

that the framers of the Constitution ever contemplated that article I, section 1, of that instrument was intended to apply to municipal elections, such as the one now under consideration, which is the mere creature of statutory enactment." The court then refers with approval to the case of *Attorney General* v. *Dillon,* 32 Fla. 545, 14 South. 383, 22 L. R. A. 124, where it was held that the suffrage provision in the Constitution of that State, prescribing the qualifications of voters at all elections under it, does not apply to elections for municipal officers, but such elections are subject to statutory regulation; and, further, that it is competent for the legislature to prescribe the qualifications of voters at the same. Continuing, the Maryland court says: "It is only at elections which the Constitution itself requires to be held, or which the legislature under the mandate of the Constitution makes provision for, that persons having the qualifications set forth in said section 1, article I, are by the Constitution of the State to be qualified electors." See also *McMahon* v. *Savannah,* 66 Ga. 217, 42 Am. Rep. 65.

We have freely used the notes to cases in Lawyers' Reports Annotated, and cheerfully acknowledge our obligation.

To recapitulate the case made by the record: We find that the power which the order appealed from denies to the General Assembly has been exercised by that body under every Constitution of this Commonwealth from 1776 down to that of 1902. Down to the Constitution of 1850, the right to vote was expressly given by the Constitutions only as to members of the General Assembly. By the Constitution of 1850 the right was extended by adding the phrase "all officers elective by the people." The Constitution of 1864 used the same expression. In 1869 the constitutional provision was extended to "all questions submitted to the people," which was by direct vote of the people stricken out in 1876, and the right "to vote for members of the General Assembly and all officers elective by the people" was substituted for it. As we have seen, the principal object of calling the convention of 1901 was to purge

the electorate of undesirable and ignorant voters, and the chief difficulty in accomplishing that object was found in the fourteenth and fifteenth amendments to the Constitution of the United States. The provision of the second article of the State Constitution confers a right of suffrage which is practically commensurate with these amendments. The Constitution of the State, exclusive of the schedule, it is conceded, does not make the act of assembly here called in question unconstitutional; but, if it be so, it is by virtue of the 18th section of the schedule. The office of a schedule is to "provide for the transition from the old to the new government," and not to introduce independent and substantive provisions of law into the Constitution, though it is conceded that it may be done if such purpose plainly appears. When the schedule was prepared, the whole of the Constitution was still within the control of the convention to alter and amend as it deemed proper, and, had such been the purpose, a provision so important as that under consideration would have been inserted in its appropriate place in plain and unequivocal language, as was done in the Constitution of 1869, and not in an unusual and inappropriate place and expressed in undecided and ambiguous terms, certain to cause doubt and to invite controversy. The phrase "all elections," as must have been known to the learned lawyers in the convention, had in many States been held to refer only to such elections as had been prescribed by the Constitution itself, and, indeed, at the time the schedule was adopted, there was no decision to the contrary, the case of *Birchmore* v. *State Board of Canvassers, supra,* having been decided since that date.

We have seen that article II was not self-executing as to some of its features, and that the schedule provided for the assembling of the legislature within five days after the Constitution went into effect. Many if not all of the elections mentioned in the Constitution are referred to. in the schedule, and it was a natural and proper thing, under all the circumstances, to insert a mandatory clause in the schedule which made it imperative upon

the General Assembly to provide at once that "all elections" within the purview of the Constitution and schedule should be held in accordance with article II.

When all these facts are recalled, and the rules of construction to which we have referred are applied to them, when we reflect that all legislative power may be exercised by the General Assembly, except as restrained by the Constitution; that it is only in cases of plain and palpable repugnancy to the Constitution that we can declare the statute to be unconstitutional; and that to doubt is to affirm the validity of the statute; we are led to the conclusion that the statute in question is a valid expression of legislative power.

*Bull and Others* v. *Read,* 13 Gratt. 78, is a leading case in this State and beyond its limits with respect to the power of the legislature to make the operation of a statute dependent upon a vote of the people thereafter to be taken, or other future contingency, and in the course of his opinion, Judge Lee speaks as follows: "As to the wisdom and expediency of this kind of legislation, this is not the place to express an opinion. To say that it is liable to be abused is but to affirm what is equally true of every mode of legislation. Whilst there may be occasions on which it may be adopted with advantage to the public interest, it may also be resorted to upon others to enable the representative to escape from his just responsibilities. Yet, however profoundly impressed the judicial mind may be in any given instance with its impropriety and inexpediency, it will not do to say that for that cause the law may be set aside. This would but be for the judiciary to set itself up as a revisory body upon the acts of the General Assembly and would be a plain usurpation upon the powers conferred upon the body. * * * How great soever the evil may be, the security against it must be sought in the wisdom and integrity of the legislative body, or, failing these, the corrective will be found in the virtue and intelligence of the people."

No matter how ingeniously arranged may be the checks and

limitations imposed by Constitutions, the point will at last be reached where confidence must be reposed, and wherever that occurs there is danger of its abuse. It is impossible in a Constitution, however elaborate, to provide for every contingency; something must be left to the discretion of those entrusted with the conduct of government. The General Assembly, the direct agent and representative of the sovereignty of the people, is the natural and necessary repository of power, to be exercised at its discretion for the general good, except as the people have seen fit, in express terms or by necessary implication, to impose limitations and restraints. Any other conclusion is founded upon distrust of the people and their representatives.

We are of opinion that the act under which the election was held is not repugnant to the Constitution of the State, but is a valid exercise of legislative power, and that the judgment of the corporation court of the city of Fredericksburg must be reversed.

HARRISON, J., dissenting:

I cannot concur in the opinion of the majority of the court in this case.

A great jurist has said that, in construing Constitutions, "every word employed in the Constitution is to be expounded in its plain, obvious and common sense meaning, unless the context furnishes some ground to control, qualify or enlarge it. Constitutions are not designed for metaphysical or logical subtleties; for niceties of expression; for critical propriety; for elaborate shades of meaning; or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them; the people adopt them; the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in

them any recondite meaning, or any extraordinary gloss."
Dwarris on Statutes and Constitutions, p. 675, quoting from
Judge Story.

The constitutional convention performed the paramount
work for which it was assembled when it reformed and defined
the electorate of Virginia.   In the preparation of article two
of the Constitution, the mind of the convention was addressed
to and absorbed with the responsible duty of determining upon
the character and qualifications of those who should constitute
our future electorate.   After this work had been satisfactorily
accomplished, the convention turned its attention to a con-
sideration of the elections to which the new electorate should
apply, and this important question was settled by the adoption
of section 18 of the schedule, which provides that, "In all
elections held after this Constitution goes into effect, the quali-
fications of electors shall be those required by article two of
this Constitution."

There is no ambiguity about this language.   It has no recon-
dite meaning.   The convention expresses its purpose in terms
that cannot be misunderstood when it declares, that *in all elec-
tions held after this Constitution goes into effect, the qualifica-
tions of electors shall be those required by article two of this
Constitution.*

This court has said that "all" is the most comprehensive
word in the English language.   I am aware of no canon of
construction which authorizes any meaning to be given to this
provision, other than that which its plain and simple language
imports.   Section 18 of the schedule is conceded to be a part
of the Constitution.   It must, therefore, be given the same
force and effect that is attributed to any other provision of the
instrument.   When it is read in connection with article two
and other provisions of the Constitution, the conclusion is, to
my mind, irresistible that the convention did not intend to
leave the legislature with power to prescribe the qualifications
of the electorate in all special elections held in this Common-
wealth.

It is said that section 62 of the Constitution is authority for the legislature to provide an electorate in local option elections, with other qualifications than those prescribed by article two of the Constitution.

Section 62 is as follows: "The General Assembly shall have full power to enact local option or dispensary laws, or any other laws controlling, regulating, or prohibiting the manufacture or sale of intoxicating liquors."

The expression "local option laws," employed in this section necessarily implies local option elections, the purpose of a local option law being to provide for holding local option elections. The convention had already determined upon the qualifications that the future Virginia electorate should possess, and there is, in my opinion, nothing in this section that warrants the view that the convention intended thereby to leave the legislature with unrestrained power to create any electorate, with or without qualifications, that to it might seem proper in local option elections. The purpose of the provision was merely to emphasize the fact that the Convention did not intend to restrict the power the legislature had always possessed to control and regulate the manufacture or sale of intoxicating liquors. The language employed, I think, excludes the idea that it was intended to engraft upon the provision already adopted, which prescribed the qualifications of the electorate, an exception in favor of local option elections. What reason could there have been for not having as pure an electorate to determine the question of local option as was required to settle any other question that might be submitted to the voters of a community?

The General Assembly of 1904, which put the Constitution into operation, as to all special elections, provided that the qualification of voters in all special and local option elections should be those prescribed by article two of the Constitution, thereby placing upon the Constitution the meaning so plainly pointed out by section 18 of the schedule. Acts 1904, p. 213. The legislature of 1908, by the act now under consideration,

amended the act of 1904, so as to reduce the measure of qualification from the standard prescribed by the Constitution in the case of special and local option elections. After prescribing what the qualifications of voters should be at any special election or any local option election, the act proceeds to define its meaning as follows: "The term special election, as used in this section, shall be construed to include such elections as are held in pursuance of a special law as well as such as are held to fill a vacancy in any office, whether the same be filled by the qualified voters of the State, or of any county, corporation, magisterial district or ward." So that under this act, the constitutionality of which is attacked, the legislature assumes the power to prescribe a different qualification for voters from those prescribed by the fundamental law, not only in local option elections but in all special elections, including such as may be held to fill vacancies in office. Acts 1908, p. 83.

By section 30 of article II of the Constitution, the legislature is given power, under stated circumstances, to enlarge the qualifications of the electorate by adding a property qualification of $250; but not in line or word do we find an intimation that it can, under any circumstances, diminish the qualifications prescribed by the Constitution.

Special elections are, in most cases, of much greater interest and importance to those immediately concerned than are elections involving the selection of public officials, and there was, at least, as much reason and necessity for throwing the protection of a purified electorate around the interests involved in those elections, as there was to prescribe limitations and restrictions for the qualification of voters who were to participate in the election of public officers.

It is insisted that the act in question was necessary to avoid inconvenience as to the time of holding special elections; that without the act, under the constitutional provision requiring the six months' prepayment of poll tax, special elections could not be held except during a portion of the year.

I do not so understand the present laws on the subject. The right of suffrage, under our Constitution, is a privilege. It is not compulsory. Every citizen who possesses the prescribed qualifications has the right to cast his ballot, but he must first qualify himself, and that is a matter that rests with him, depending upon his own voluntary act. One of the essentials of his qualification as a voter is, that he shall have personally paid, at least six months prior to the election, all State poll taxes assessed or assessable against him, under the Constitution, during the three years next preceding that in which he offers to vote. The three years next preceding that in which he offers to vote plainly refers to the three *tax years* preceding that in which he offers to vote. The tax year commences on February first and ends on February first of each year. By section 491 of the Code, it is made the duty of the commissioner of the revenue to ascertain and assess all male persons of full age and sound mind residing in his district on the *first day of February in each year.* It is to my mind clear, that under existing tax laws any voter who pays his poll taxes on any day prior to the first day of August in any year can vote in every election held on any day in the next succeeding year, beginning on the first day of February and ending the following February. For example, if the poll tax is paid before the first day of August, 1908, the voter so paying is entitled to vote in any election held in any month or on any day of the month during the year beginning February 1, 1909, and ending the first day of the following February. Hence, every voter can qualify himself to vote in all elections by paying his poll tax prior to the first day of August in each year.

But, it is said, the treasurer may not be ready to receive the poll taxes prior to the first day of August. No reason is perceived why he should not be. If, however, any such inconvenience should arise under the existing laws, the legislature has the power to modify those laws so as to remedy the inconvenience. The laws should be made to yield to the Constitution and not the Constitution to the laws.

That the Constitution contemplates other elections than those held for the election of officers and members of the General Assembly fully appears from numerous sections of that instrument. I will advert to two by way of illustration.

Section 98 provides for special elections to determine the question of abolishing the corporation courts in cities of the second class, by the *qualified* electors of such cities.

Section 127 provides for an election to determine the issue of bonds by a city, by a majority of the *qualified* voters of such city, either at a general or special election for that purpose.

Can it be doubted that the *qualified* voters mentioned in these provisions for *special* elections means voters who are qualified in the manner prescribed by article two of the Constitution? And when the Constitution, in a subsequent provision, says: *"In all elections held after this Constitution goes into effect, the qualifications of electors shall be those required by article two,"* is there room to doubt that it was intended to embrace the special elections which it expressly mentions and provides shall be submitted to the *qualified* voters?

Much is said of the provisions of former Constitutions of this State, and the powers that the legislature had under them, as bearing upon the construction of our present Constitution. No former Constitution of this State was adopted under the conditions and circumstances that surrounded her people at the time of the adoption of the present Constitution. Cases are cited construing the Constitutions of other States, as authority for the construction put upon this Constituion. I do not know the circumstances under which those Constitutions were framed, nor do I know the motives which impelled the action of the framers. These authorities can, therefore, have but little weight in determining the grave question now involved in the construction of our own Constitution.

As illustrative of the policy of the State in the past, much importance is attached to the circumstance, that the Constitution of 1869 provided that the electorate which it established should vote "upon all questions submitted to the people," and

that seven years afterwards that provision was stricken out and the language "for members of the General Assembly and all officers elective by the people," was substituted.

The Constitution of 1869, known as the Underwood Constitution, was imposed upon an unwilling people by an alien and inimical body. It had established an ignorant and vicious electorate that was a menace to our civilization. The amendment mentioned was the first effort of an oppressed people to do what they might to relieve the situation then confronting them. With that end in view they adopted the amendment referred to, because they preferred that a democratic white legislature should prescribe the electorate which was to determine the important questions involved in special elections, rather than have such questions settled by the corrupt electorate prescribed by the Constitution of 1869. The legislature was all we had at that time, but since then the people of Virginia have framed their own Constitution and defined their own electorate, and are no longer confronted with the perils that made it necessary for them, at the time, to lodge that power in the hands of the legislature.

The present decision is far-reaching in its effect and consequences. When I recall, as I must do, the history of the times, and remember that the purpose for which the recent convention was called was primarily and above all else to release the people of this Commonwealth from the menace of a debased electorate, and to provide for them a reformed and purified electorate, I am unable to give my assent to the conclusion that those high purposes have failed, and that the right of suffrage has been left by the Constitution to the unrestrained power of the legislature to create any electorate it may see fit in all that large, important and rapidly increasing class of elections, other than general elections for members of the legislature and officers elective by the people.

For these reasons, I am of opinion that the judgment of the learned judge of the corporation court of the city of Fredericksburg is right and should be affirmed.

*Reversed.*