Argued March 20, affirmed as modified June 6, petition for
rehearing denied July 6, 1951

# SWIFT & COMPANY and ARMOUR & COMPANY
# *v.* PETERSON, Director, OREGON STATE
# DEPARTMENT OF AGRICULTURE

### 233 P. 2d 216

*Catharine Carson Barsch,* Assistant Attorney General, of Salem, and Blaine Hallock, of Baker, argued the cause for Appellant. With them on the brief was George Neuner, Attorney General, of Salem.

*Manley B. Strayer,* of Portland, argued the cause for Respondents. With him on the brief were Hart, Spencer, McCulloch, Rockwood & Davies, of Portland.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK, LATOURETTE and WARNER, Justices.

WARNER, J.

This is a suit for a declaratory judgment construing Chapter 193, Oregon Laws 1949, which provides for the identification of livestock and the prevention of livestock theft. A copy of the relevant sections of the Act, hereinafter referred to as the Act of 1949, is appended to this opinion.

The plaintiffs, Swift & Company and Armour and Company, are engaged in the packing house business, the former maintaining a plant in North Portland, Oregon, and the latter in Portland, Oregon. Both purchase large numbers of livestock at the stockyards of Portland Union Stockyards Company and elsewhere for processing meat and meat products, which they distribute throughout the states of Oregon and Washington and in other localities beyond the boundaries of this state.

The defendant, Ervin L. Peterson, is the director of the Department of Agriculture of the state of Ore-

gon, and by § 5 charged with the duty of administering the Act of 1949.

Portland Union Stockyards is an Oregon corporation operating public stockyards at North Portland, Oregon. These stockyards are posted as such and subject to the jurisdiction of the secretary of the United States Department of Agriculture under the provisions of the Federal Packers and Stockyards Act, 1921.

As disclosed by the findings of fact, livestock from within and without the state of Oregon are received and handled in large numbers at the Portland Union Stockyards. Upon entering such stockyards, all livestock of shipments originating in Oregon not accompanied by an Oregon brand inspection certificate are inspected by Oregon brand inspectors for the purpose of verifying ownership thereof.

Livestock shipments originating in foreign countries and states other than Oregon are also received in large numbers at the Portland Union Stockyards. The evidence shows that in many instances such livestock from out of the state are accompanied by brand inspection certificates issued by the officials of the country or state in which said shipments originate. Livestock shipped from the state of Washington are received at the Portland stockyards accompanied by a transportation certificate issued under the laws of that state. In such instances such Washington livestock are inspected upon their arrival at the stockyards in this state by a brand inspector of that state and a Washington state brand inspection certificate is issued covering them.

A large volume of the livestock received at the Portland Union Stockyards from outside the state of Oregon arrives by common carrier and is accompanied by carrier's way bills showing the country or state of

origin. In addition, the Portland Union Stockyards Company keeps records concerning all livestock received at such stockyards, showing which state is the point of origin, and the purported ownership of all stock so received from outside the state of Oregon.

Both plaintiffs purchase large numbers of livestock shipped in from areas outside of Oregon, and thereafter transport the same to their respective premises for processing. In the plant operated by Armour and Company the livestock are usually shipped by common carrier directly to its plant. The principal sources of the out-of-state livestock, in the order of importance, are Idaho; Washington; Alberta, Canada; California; Montana and Colorado. All of these sources have brand inspection laws requiring brand inspection before the stock may be shipped from such states or countries.

Defendant has ruled and advised the plaintiffs that if they sell or slaughter or permit the sale or slaughter of any livestock in or through their respective establishments prior to having said livestock inspected by a brand inspector of this state, they will be in violation of § 18 of the Act. To support this contention, defendant construes the Act of 1949 as applicable to all livestock sold or slaughtered by plaintiffs irrespective of the point from whence the livestock were shipped "except as otherwise provided by Chapter 9, Title 7, U. S. C. A., as amended." (Packers and Stockyards Act, 1921.)

This situation moved the plaintiffs to seek a declaratory judgment to the effect that the Act of 1949 did not require a brand inspection of livestock shipped from points outside of the state of Oregon for sale and slaughter in this state, and, in the event the court held that such livestock originating outside of the state of

Oregon were to be brand inspected as required by the defendant, then for a further declaration that the Act is unconstitutional and void.

After trial the court entered a decree, the salient and challenged provision of which is as follows:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the brand inspection requirements of Chapter 193, Oregon Laws 1949 apply only to livestock originating within the State of Oregon. Livestock brought into Oregon from other states and foreign countries for immediate slaughter and such livestock purchased for immediate slaughter at Portland Union Stockyards or elsewhere while in interstate commerce are not subject to the brand inspection requirements of Chapter 193, Oregon Laws 1949 and an inspection of such livestock by an Oregon brand inspector is not authorized or required by said Act."

It is from this decree that the defendant appeals.

■ This action is properly brought under the Uniform Declaratory Judgment Act of this state. Section 6-602, O. C. L. A., authorizes the determination of the rights or status of interested parties when they are affected by a "constitution, statute * * *." Although the defendant mildly suggests the contrary, the record discloses, to our satisfaction, the presence of a justiciable controversy and that the court has jurisdiction of the parties and the subject matter. *Webb v. Clatsop School Dist. No. 3,* 188 Or. 324, 215 P. 2d 368; *Oregon Cry. Mfgs. Ass'n v. White,* 159 Or. 99, 78 P. 2d 572.

The essence of the controversy between the parties, as we see it, is: Does the Act of 1949 contemplate brand inspection for livestock coming into Oregon from other states or countries? If an answer is in the negative, then there will be no necessity for an answer to the constitutional questions raised.

■ In 2 Lewis' Sutherland, Statutory Construction (2d ed.) 927, § 498, it is said:

"* * * Whenever an act can be so construed and applied as to avoid conflict with the constitution, and give it the force of law, this will be done. Where one construction will make a statute void for conflict with the constitution, and another would render it valid, the latter will be adopted though the former at first view is otherwise the more natural interpretation of the language. Every intendment should be made to favor the constitutionality of a statute. The legislature is presumed to act in view of the constitution and not to intend a violation of its provisions or the enactment of an invalid law."

See *State of Oregon v. Standard Oil Co.*, 61 Or. 438, 449, 123 P. 40, Ann. Cas. 1914B 179. Also see *State v. Anthony*, 179 Or. 282, 300, 169 P. 2d 587; *Fullerton v. Lamm*, 177 Or. 655, 670, 163 P. 2d 941, 165 P. 2d 63; *Major Creek Lumber Co. v. Johnson*, 99 Or. 172, 183, 195 P. 177; *Yu Cong Eng v. Trinidad*, 271 U. S. 500, 518, 70 L. Ed. 1059, 46 S. Ct. 619. If there is any doubt respecting its constitutionality, the statute will be upheld unless it is clearly repugnant to some provisions of the Constitution. 11 Am. Jur., Constitutional Law, 782, § 128; *City of Portland v. Stevens*, 180 Or. 514, 527, 178 P. 2d 175; *Herbring v. Lee*, 126 Or. 588, 596, 269 P. 236, 60 A. L. R. 1165.

■ The cardinal rule for the construction of a statute is to ascertain from the language thereof the intent of the lawmakers as to what purpose was to be served, or what object was designed to be attained. *Leonard v. Ekwall*, 124 Or. 351, 359, 264 P. 463; *Fox v. Galloway*, 174 Or. 339, 346, 148 P. 2d 922. We accomplish this with such aid as may be found in the rules of interpretations and legitimate extrinsic sources, always keeping in mind that the legislative intent to enact a

valid and constitutional law will be assumed. *Fullerton v. Lamm,* supra, at page 670. When the legislative intent has been ascertained, it should be given effect, even though, in doing so, the literal meaning of the words used is not followed. *Allen v. Multnomah County,* 179 Or. 548, 554, 173 P. 2d 475; *Wood v. State,* 133 Tex. 110, 126 S. W. 2d 4, 121 A. L. R. 931, 935. In arriving at the legislative intention, it is proper for the court to take into consideration the policy and purposes of the Act, and to consider in that connection whether or not such a policy and purposes will be attained by a literal interpretation of the language used. *Banfield v Schulderman,* 137 Or. 167, 178, 296 P. 1066, 298 P. 905, 89 A. L. R. 504; *Allen v. Multnomah County,* supra, at 554. It is the express intent of the legislature which we seek, and to do this we must look to the entire statute. *Sunshine Dairy v. Peterson,* 183 Or. 305, 317, 193 P. 2d 543; *State ex rel. Peterson v. Woodruff,* 179 Or. 640, 173 P. 2d 961. In so doing we may include the title in our consideration. *City of Portland v. Duntley,* 185 Or. 365, 386, 203 P. 2d 640; *State ex rel. Bylander v. Hoss,* 143 Or. 383, 386, 22 P. 2d 883.

It is from a combination and application of all these rules that such intent is derived. *Fox v. Galloway,* supra, at 346; *Sunshine Dairy v. Peterson,* supra, at 317.

Before we embark on a discovery of the legislative intent, we think it is in order to first examine and dispose of some matters raised by defendant which have a related interest to that inquiry.

One of these matters relates to the meaning of the word "origin" and its derivatives, "originated," "originating" and "originates." The Act does not define any of these words. In the absence of a statutory

definition, the defendant would have us read them in what he claims is their natural and usual sense, i. e., as referring to the place of birth of the livestock. Defendant further argues that such a definition indicates the legislature's intent to bring within the protection of the Act all livestock born in Oregon, as well as all livestock born outside of the state which are later transported into the state.

We cannot agree that the word "origin" or any of its derivatives is limited to the sole and tortured meaning which the defendant applies. An alternative definition is that the word "origin" and its derivatives, as used in the Act, relate to the place in the state of Oregon where any shipment of livestock begins. If this latter definition is correct, it completely controverts the conclusion indulged in by the defendant.

 We have on several occasions said that in order to prevent absurdities the courts will refuse to give words their literal and actual meaning and will adopt some other meaning within the reasonable scope of the words employed. *Fullerton v. Lamm,* supra at 671; *State v. Gates,* 104 Or. 112, 123, 206 P. 863. This does not mean, however, that we will trifle with words which admit of only one meaning; but if the language of a phrase or the meaning of a word permits of two constructions, one absurd or mischievous and the other reasonable and wholesome, we will not hesitate to pursue the common sense course and adopt the reasonable and wholesome construction when by so doing we can better discover and preserve the legislative intent. *State v. Gates,* supra at 123; *State v. McGuire,* 24 Or. 366, 33 P. 666, 21 L. R. A. 478.

Even without the foregoing rules in mind, we find no difficulty in discovering what the legislature intended by the employment of the word "origin" and

its derivatives in the Act of 1949, and our conclusions are reached without indulging in strained constructions.

The word "origin" is found three times in the Act; the words "originated", "originating" and "originates" each appear once. The first time we meet the word "origin" is in subsection 18 of § 2, where it is a part of the definition of "transportation certificate" and wherein it is directed that the form of certificate used shall designate *"the point of origin* and the point of destination of such transportation." We next find the word "origin" in subsection 19 of § 2, which defines the meaning of the words "brand inspection certificate." This subsection provides that the brand inspector issuing such certificate shall certify to the best of his knowledge that the person presenting livestock for inspection is "authorized *to move such livestock from a specified point of origin* to a specified point of destination." The last place where "origin" is found is in subsection 2 of § 7. It there appears in a phrase reading in part, "from date of *origin of movement* from this state." The word "originates" is in § 7 and appears in a phrase reading in part, "when the transportation of livestock *originates* at a point in the state of Oregon." The word "originated" is employed in § 10 in a phrase reading in part, "the county where *the shipment originated."* "Originating" is used in § 20 relating to stockyards subject to the jurisdiction of the Secretary of Agriculture of the United States and is part of a phrase reading, "characteristics of livestock *originating in, or shipped from, the state of Oregon."* (Italics ours.)

■ We are convinced that the word "origin" and its derivatives, as employed in the Act of 1949, do not

permit any meaning or construction other than referring clearly and specifically to the point or place in the state of Oregon where any shipment of livestock begins in its movement to its final destination and do not remotely or inferentially refer to the place of birth or origin of any livestock covered by the Act.

The defendant also represents that the Act of 1949 is a recording statute. Taking the Act of 1949 by its four corners and speaking generally, we are persuaded that its sole and only purpose was to create a new and more effective aid in discouraging cattle theft by the discovery and possible recovery of the stolen property. The inspection of the brand is but a means to that end.

Defendant urged in oral argument that the statute was intended to establish a record of ownership of Oregon owners of cattle brought into the state as well as those that are produced in this state. In his brief he says, "The act provides a system of recording ownership of animals by brand inspection," and, in support of this, asserts that all specifications of brand inspections are filed in defendant's principal office in Salem "as state records," citing us to. Oregon's Department of Agriculture Regulation No. 375 and §§ 32-1111 and 32-1119, O. C. L. A. In this we cannot agree. Rule 8 of Regulation No. 375 reads: "* * * The original of each [brand inspection] certificate shall be submitted by the brand inspector to the Salem office of the department." This is obviously not a rule authorizing recording in the sense referred to by the defendant, nor do we find anything in the Act which contemplates a recording of any document required under the Act as a basis for a record giving constructive notice of ownership as to the animals inspected, nor does the Act confer upon the director or the depart-

ment, or any other authority, power to create a record of that kind. No person can set up a system of recording documents, the record of which is intended to give the public constructive notice of their contents without statutory authorization. Even if the Act could be construed as contended for by the defendant, the ownership disclosed by the certificates would have but a limited value as notice to the world of livestock ownership, in view of the fact that the certificates themselves, if so recorded, would cover only those animals which were inspected at the beginning or the end of their transport. Moreover, the Act of 1949 specifically exempts from its operation stock "when drifted, herded or trailed to or from pasture or range in the regular course of ranch operation" and stock when on exhibit or engaged in racing (subsections 17a and b of § 2). These exclusions necessarily would render the Act of 1949 valueless as a recording act to give notice of ownership, if such were the legislative intent. It is the recorded brand that makes for a record of ownership (see §§ 32-1111 to 32-1124, inclusive, O. C. L. A.) not the certificate subsequently issued under the Act of 1949 with their recitals of brands previously recorded.

In our quest for the legislative intent, we now address ourselves to an examination of several of the most pertinent sections of the Act.

 The defendant places much reliance on the word "all" as it is used in the definition of the word "livestock" (Chapter 193, Oregon Laws 1949, subsection 1 of § 2) reading as follows: " 'Livestock' means *all* cattle, horses, mules and asses." (Italics ours.) He asserts that the meaning of the word "all," as there employed, is in its most inclusive sense and thereby evidences the legislative intent to extend the Act to

*all* livestock coming into Oregon from other states even before they have ceased to be a part of the flow of interstate commerce. In this proposition the defendant is, at the outset, confounded by the language of the first sentence in § 2 which is introductory to nineteen definitions which follow. It reads: "Words and phrases used in this act, *unless otherwise required by the context,* shall be deemed to have the following meaning * * *." (Italics ours.) But even without the presence of this legislative aid in construction, militating as it does against defendant's position, we find ample authority for holding that the use of the word "all" in the definition of the word "livestock" means only livestock which are a part of shipments originating in this state.

The generality of the word "all" is frequently limited by the context and sometimes limited by the subject matter. 3 C. J. S. 867. Also see *Willis v. Kalmbach,* 109 Va. 475, 485, 64 S. E. 342, 21 L. R. A. (N. S.) 1009, where the court said: "The meaning to be given to it [all] in any particular case must be determined by its context."

 It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because it is not within its spirit or within the intention of its makers. *Fox v. Galloway,* supra, at 347, and the cases there cited. In 11 Am. Jur., Constitutional Law, 734, § 100, it is said:

"The rule is also generally accepted that when a statute is broad enough to cover matters without the state as well as within, and as applied to matters without the state it would be unconstitutional, the court may restrict the application to matters within the jurisdiction of the state, unless the statute clearly indicates a different intent."

Also see *Singer Sewing Machine Co. v. Brickell,* 233 U. S. 304, 314, 58 L. Ed. 974, 34 S. Ct. 493.

In 50 Am. Jur., Statutes, 511, § 487, we find:

"* * * a statute is prima facie operative only as to persons or things within the territorial jurisdiction of the lawmaking power which enacted it. These rules apply to statutes using general words, such as 'any' or 'all,' in describing the persons or acts to which the statute applies. They are particularly applicable where the statute would be declared invalid if given an interpretation resulting in its extraterritorial operation."

See *United States v. Katz et al.,* 271 U. S. 354, 362, 70 L. Ed. 986, 46 S. Ct. 513; *State v. Lancashire Fire Insurance Co.,* 66 Ark. 466, 51 S. W. 633, 45 L. R. A. 348; *State v. Peet,* 80 Vt. 449, 68 A. 661, 14 L. R. A. (N. S.) 677; 11 Am. Jur., Constitutional Law, 734, § 100.

Section 7 of the Act is, for the purposes of our present consideration, the most important provision in the Act. All of the occasions and circumstances demanding brand inspection are comprehended within its terms. It is the focal point of our greatest interest. It is here that we look to find when and where such brand inspections shall be made. It consists of five subsections, the first three of which are our particular concern and which should be construed together.

Subsection 1 deals with livestock "transported from any point in the state of Oregon to or through any point outside of the state of Oregon." Its interest is directed only to livestock shipments *originating in this state* and going to a terminus outside of the state. It requires a brand inspection certificate for such shipment, or in lieu thereof, a "transportation certificate"

(subsection 18, § 2) when no brand inspector is available to make the required inspection.

■ Any suggestion that a brand inspection of the kind provided for by the first subsection of § 7 might be deemed to be a burden upon or interference with interstate commerce is answered by the holding in *Territory of New Mexico ex rel. McLean v. Denver & Rio Grande R. R. Co.,* 203 U. S. 38, 51 L. Ed. 78, 27 S. Ct. 1, wherein it appears that the legislature of the Territory of New Mexico in 1901 enacted a law which in essence provided that no railroad should receive for shipment "beyond the limits of the territory" any livestock hides which had not been previously inspected and tagged by a duly authorized brand inspector of the cattle sanitary board of New Mexico. The section of the New Mexico act referred to in the opinion was similar to subsection 1, § 7 of the Oregon Act of 1949 in that it, too, provides for a brand inspection of all livestock shipments destined to points outside of the state. It was urged in the Supreme Court of the United States that the New Mexico statute laid a special burden upon interstate commerce. After declaring that the purpose of the provisions of the Act was "to prevent the criminal or fraudulent appropriation of cattle requiring the inspection of hides," the court in upholding the territorial law said:

"* * * the exercise of the police power may and should have reference to the peculiar situation and needs of the community. The law under consideration, designed to prevent the clandestine removal of property in which a large number of the people of the territory are interested, seems to us an obviously rightful exercise of this power. It is true it affects interstate commerce, but we do not think such was its primary purpose, and while it

may have an effect to levy a tax upon this class of property, the main purpose evidently was to protect the people against fraud and wrong.''

■ We think that it is appropriate to here note that when any state enactment only incidentally affects interstate commerce, that fact does not, of itself, render such act invalid. *Missouri, Kansas & Texas R. Co. v. Haber*, 169 U. S. 613, 42 L. Ed. 878, 18 S. Ct. 488; *Asbell v. Kansas*, 209 U. S. 251, 52 L. Ed. 778, 28 S. Ct. 485; *Bayside Fish Flour Co. v. Gentry*, 297 U. S. 422, 425, 80 L. Ed. 772, 56 S. Ct. 513.

The second classification of livestock subject to inspection is found in subsection 2 of § 7 and reads: ''Livestock transported *from a place within this state to a range outside* this state and returned to a place within the state of Oregon after movement therefrom shall be inspected as to brands before removal from the state of Oregon.'' (Italics ours.)

It will be observed that the shipping character of the stock to be inspected is identical in subsections 1 and 2. Both provide for a brand inspection *in Oregon at the beginning of an outstate journey.* The only statutory difference in status between the stock referred to in the first two subsections is that those covered by subsection 2 are stock shipped with the prospect of a return to a place ''within the state of Oregon within eight months from date of origin of movement from this state.''

■ The reason for subsection 2 and the distinction between it and the first subsection of § 7 becomes clear when we read the remaining portion of subsection 2 of § 7 setting up, as it does, the machinery for the recoupment of the inspection fees charged against such livestock before moving to their temporary range out-

of-state. In neither of these subsections do we find anything impinging upon the Federal powers under the commerce clause. *Territory of New Mexico ex rel. McLean v. Denver & Rio Grande R. R. Co.,* supra.

Subsection 3a of § 7 reads as follows:

"Livestock transported, the destination of which is any slaughterhouse, packer, stockyard, livestock auction market or market agency within the state of Oregon, shall be accompanied by either a brand inspection certificate or a transportation certificate. If accompanied by a transportation certificate only, a brand inspection must be made and a brand inspection certificate must be issued at the point of destination."

Defendant urges that this applies to all "cattle going to any slaughterhouse in Oregon regardless of where they are born and regardless of how they got into Oregon." We do not find ourselves in agreement with the inclusiveness of this interpretation. It is important to note that this subsection requires that all livestock shall be accompanied by either a brand inspection certificate or a transportation certificate. This, in our opinion, means that the shipments referred to in subsection 3 necessarily must be a part of a shipment which originated or started from some point in Oregon with an Oregon slaughterhouse or any one of the other entities mentioned as its destination. Our reasons for this conclusion will shortly follow.

In the first three subsections of § 7, which, as we have said, constitute the sole instance when and where brand inspection is required, we find two factors common to all, that is: (1) that the shipment must be accompanied by a *brand inspection certificate, or* in lieu thereof, as the circumstances permit, a *transportation certificate;* and (2) by express words or by

requiring the use of a transportation certificate as in subsection 3, § 7, it is clear that every shipment must originate in Oregon.

The provisions mandating the use of a transportation certificate, when a brand inspection certificate cannot be secured, are of important significance in our interpretation of the Act to determine the pattern of the legislative intent. In them is found the emphasis *on the origin of the shipment in Oregon* which is the key that opens the door to our understanding and also becomes the crucial test of the right to make a brand inspection under the Act.

We think that the omission from the precise requirements of §§ 7 and 18 of any reference to livestock coming into the state for the purpose of sale or slaughter, or indeed for any other purpose, is cogently significant. We view the absence of such language as evidence of legislative consciousness of the limitations on its power to impose burdens or restrictions on interstate commerce, or it may, with equal force be attributed to the legislature's knowledge that virtually all livestock coming to stockyards and slaughterhouses from other states have been previously identified and the ownership verified by brand inspections or other criteria in said outside states, and that no practical purpose would be served by requiring an additional Oregon brand inspection upon arrival at their final destination in the state.

A "brand inspection certificate" is a document which can only be executed by a brand inspector (subsection 19, § 2) and a "brand inspector," as defined by the Act, means a person appointed pursuant to the provisions of the Act (subsection 6, § 2). He is a police officer of the state of Oregon. It therefore follows

that the only brand certificates which acquire any legal status under the Act are those issued by an Oregon brand inspector issued in Oregon as to livestock in a transport which begins in Oregon.

A "transportation certificate" is a document executed by the owner of or person rightfully in possession of livestock in transport (subsection 18, § 2) and used only in lieu of a brand inspection certificate when "the transportation of livestock *originates at a point in the state of Oregon* where no brand inspector is available" (subsection 1, § 7) and can only continue in use as an authority for shipment until the livestock reach "the nearest point en route in the state of Oregon where a brand inspector is available." (Subsection 1, § 7.) (Italics ours.) The essential thing here to recall when reading what follows is that a transportation certificate is only available and required when the livestock shipment "originates at a point in the state of Oregon."

We turn back for a moment to reexamine the language of subsection 3a of § 7 relating to livestock transported to "any slaughterhouse, packer, stockyard * * *" and find it there mandated that such shipments *"shall be accompanied* by either a brand inspection certificate or a transportation certificate," which, in terms of the legal situs for the issuance of either of said certificates, means that the transport of the shipments covered thereby began at some point in the state of Oregon. (Italics ours.)

A heavy penalty and obligation is imposed by § 11 upon any "common carrier, contract carrier or private carrier" which transports livestock without receiving a "brand inspection certificate or transportation certificate." Unless this provision is confined to ship-

ments originating in Oregon, it would affect all interstate movements entering the state and, in and of itself, create burdens upon and interference with that type of commerce and carrier contracts made in other states in connection therewith which could raise serious constitutional questions if an attempt was made to apply it to shipments other than those originating in the state of Oregon; but as we read and interpret § 7, this possibility is avoided, as it is our duty to do under the rule referred to in 2 Lewis' Sutherland, Statutory Construction (2d ed.) 927, § 498, and cited cases following.

This inquiry brings us unavoidably to the conclusion that the only livestock amenable to brand inspection under the Act of 1949 are those which are a part of shipments originating in the state of Oregon, and we are convinced that the legislature did not intend otherwise.

In further confirmation of the foregoing conclusion, we turn to review several other sections of the Act. Section 10, in our opinion, in and of itself dissipates all doubt as to the limited boundaries of application envisoned by its authors. No legislation is presumed to be intended to operate outside of the jurisdiction of the state enacting it. In fact, a contrary presumption prevails and statutes are generally so construed. 50 Am. Jur., Statutes, 510, § 487; *Sandberg v. McDonald*, 248 U. S. 185, 195, 63 L. Ed. 200, 39 S. Ct. 84; *State v. Lancashire Fire Ins. Co.*, supra, 66 Ark. 466. The legislature was not concerned with the protection of owners of livestock in other states, nor could it legally have done so, for the exercise of the police power is limited to the protection of the people and property of the state of the enactment.

*Savage v. Jones,* 225 U. S. 501, 56 L. Ed. 1182, 32 S. Ct. 715.

■ Section 10 directs the brand inspectors to take up all transportation certificates at the time they make their brand inspection and thereafter "deliver such certificates *to the sheriff of the county wherein the shipment originated* and such sheriff shall retain the same as permanent records." (Italics ours.) Under no rule of statutory construction can it be successfully maintained that the sheriffs of counties referred to were officers of counties outside the boundary of this state. No state or nation can by its laws directly affect, bind or operate upon property or persons beyond its territorial jurisditcion. 50 Am. Jur., Statutes, 509, § 485; *Baltimore & Ohio R. Co. v. Chambers,* 73 Ohio St. 16, 76 N. E. 91, 11 L. R. A. (N.S.) 1012, 1015; Storey, Conflict of Laws (8th ed.) 21, 22, §§ 18 and 20. If we give any weight to defendant's thesis, it suggests the question: What disposition does the Act make for the filing of transportation certificates accompanying livestock shipments *originating outside of the state?*

The statute's silence in this respect is, to us, a further demonstration that the legislature had no intention to reach shipments originating outside of the state, well knowing that it had neither jurisdiction nor power to compel the execution of such certificates by persons charged with such shipments.

■ The brand inspection certificates of states other than Oregon are not constructive notice of ownership of the branded stock in this state in the absence of a statute making them so. *Wilson v. Buchenau,* 43 F. Supp. 272, 277. The Act under examination does not give them that character. *United States v. Katz,* supra; *Hershorn v. People,* 108 Colo. 43, 113 P. 2d 680, 139

A. L. R. 297. In Oregon, however, we have brand recording records to which a brand inspector can resort and verify his brand inspection as to the ownership of Oregon recorded brands (§ 32-1115, O. C. L. A., as amended by Chapter 172, Oregon Laws 1949).

██ The Act of 1949 is a penal statute (see § 21) and must necessarily be strictly construed. *Chrisman v. Corbin*, 169 Or. 332, 341, 128 P. 2d 959. However, this does not prevent a reasonable or sensible construction. In 50 Am. Jur., Statutes, 442, § 421, it is said:

"The rule of strict construction of a penal law does not prevent the application of the rule of a reasonable or sensible, and fair or just construction of the statute as a whole, in order to avoid an absurdity which the legislature ought not to be presumed to have intended. Under this rule, general terms descriptive of a class of persons made subject to a criminal statute may, and should, be limited, where the literal application of the statute would lead to extreme or absurd results, and where the legislative purpose, gathered from the whole act, would be satisfied by a more limited interpretation."

Section 14 of the Act subjects to penalty every person who shall knowingly make any false certificate or who shall certify as to any material fact required by the Act as set forth in any of such certificates. It is hornbook law that statutory violations must be violations originating in the state of Oregon. When applied to the execution of transportation certificates, it must be limited to those made in the state. We cannot seriously impute to the legislature the vain hope of dictating in Oregon a form of certificate to be employed by cattlemen residing in Colorado, Nevada or other western states, thereby rendering them an-

swerable to the penalties of the statute for failure to comply therewith.

Both parties have given much attention to § 20 of the Act, wherein we find reference to § 217a of the Packers and Stockyards Act. In general, it may be said that the Packers and Stockyards Act, 1921 (7 U. S. C. A., § 181 and 229) has to do with the regulation of stockyards and the slaughtering of livestock and dealing in meat products when such activities have direct relation to interstate commerce. *Jungst v. Baldridge,* 51 F. 2d 379, 382.

By the careful classification of the livestock which are the objects of inspection under the Act, the legislature has, with words of art, carefully avoided conflict with any clauses of the Constitution of the United States relating to interstate commerce and Federal legislation enacted pursuant thereto. This avoidance is further emphasized by the provisions of § 20. By virtue of § 217a, the Secretary of Agriculture of the United States may upon written application authorize the charging and collecting, at any stockyard subject to the provision of that Act or any department or agency of any state in which branding or marking livestock as a means of establishing ownership prevails by custom or statute, of a reasonable and nondiscriminatory fee for the inspection of brands, marks and other identifying characteristics of livestock "originating in, or shipped from, the state of Oregon, for the purpose of determining the ownership of such livestock." By the terms of § 20 of the Act of 1949, the brand inspection for which authority might be obtained under the Federal act, is expressly limited to the "inspection * * * of livestock * * * *originating in, or shipped from, the state of Oregon.*" (Italics ours.)

The language emphasized finds its counterpart in the Federal act (7 U. S. C. A., § 217a).

Any broader right would bring the statute in conflict with Federal law. In our opinion, the presence of § 20 connotes a studied desire upon the part of the legislature to avoid such conflict. We can agree, however, with appellant that the Federal Packers and Stockyards Act does not apply to property outside of posted stockyards, as the same are defined by that Act.

■ Section 18 marks the point of plaintiffs' greatest interest. This section is the one most directly touching their operations. The only question plaintiffs raise with reference to it is by way of discovering whether or not it is applicable to livestock brought into the state as shipments in interstate commerce. The defendant insists that it dictates that such shipments must be brand inspected. We have, therefore, deferred examining this section until we had completed our inquiry on the legislative intent as reflected by the sections hereinabove discussed, for this section, like the others, cannot be read literally and as unrelated to the rest of the Act. Based upon what we have heretofore said, we are of the opinion that the livestock requiring brand inspection under § 18 are only such livestock as can be identified as a part of a shipment originating in the state of Oregon.

■ In 2 Sutherland, Statutory Construction (3d ed.) 535, § 5201, it is said: "* * * if words used in a prior statute to express a certain meaning are omitted, in construing words claimed to have the same meaning it will be presumed that a change of meaning was intended." With this further rule of construction before us, we look to Chapter 404, Oregon Laws, 1947,

which was the statutory predecessor to the Act of 1949 in purpose, i.e., for the identification of livestock and the prevention of livestock theft by brand inspection. It was repealed by § 23 of the Act we are presently construing.

■ Here we find that the director, the defendant herein, was authorized to establish open market areas "at any point within or *without the state of Oregon* where Oregon brand inspection is maintained" (subsection 1, § 6, Act of 1947). (Italics ours.) In § 7 of that Act relating to fees is the provision that "Oregon brand inspectors shall inspect *outstate livestock*" for a fee of five cents per head as against a fee of ten cents per head for the inspection of livestock in this state. (Italics ours.) No place in the Act of 1949 do we find precise words or phrases which refer to stock "without the state of Oregon" or "outstate livestock," or any equivalent words, nor is there any differentiation in fees as between kinds of livestock inspected. We think that this is a matter of significance indicating, under the statement of the foregoing rule from 2 Sutherland, supra, in our opinion, a legislative design to remove any question of conflict between the Act of 1949 and the Federal law or Constitution which the earlier Act of 1947 suggested by its references to inspection of out-of-state livestock.

■ If a state law is truly an inspection law, the Federal courts will not interfere with it because of supposed excessiveness of fees. *Neilson v. Garza,* 2 Woods 287; *Patapsco Guano Co. v. Board of Agriculture of North Carolina,* 171 U. S. 345, 355, 43 L. Ed. 191, 18 S. Ct. 862. A statute of somewhat similar character (Chapter 148, Idaho Laws, 1929) was held not to be a revenue measure but intended for pre-

vention and detection of livestock theft. *Jungst v. Baldridge,* supra, 51 F. 2d 380.

■ Any objection to the Act as not being proper exercise of the police power cannot be sustained. The legislature, subject to the rights of Congress, can certainly regulate business or commerce within the state to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, theft, dishonesty or the spread of any evil or harm to persons or property within the state. In doing this, it is merely exercising the police power for the benefit of the public. *Star Square Auto Supply Co. v. Gerk,* 325 Mo. 968, 30 S. W. 2d 447, 459. Also see Freund, Police Power (1904) 87, § 86. In *Jungst v. Baldridge,* supra, at 381, it is said: "That reasonable means for the prevention and detection of the theft of live stock, particularly in a country where they commonly run on the open range, are within the police powers of the state, is too clear to admit of discussion * * *."

■ Construing this Act in *pari materia* with the other statutes of this state providing for the recordation of livestock brands (§§ 32-1111 to 32-1124, inclusive, O. C. L.A.) the various penal statutes relating directly thereto (§§ 32-1128 to 32-1131, inclusive, O. C. L. A.) as well as the abundant legislation of a protective character relating generally to the livestock business, we find that the Act of 1949 is but an additional aid to those ends which may be said to be "self defensive in character" (*Railroad Co. v. Husen,* 95 U. S. 465, 471, 24 L. Ed. 527) in that: (1) it leads to the recovery of stolen property with its incident possible detection of those responsible for the theft; (2) it makes Oregon markets unsafe for the disposition of stolen spoils; and (3) it tends to protect honest citizens of the state

against the innocent acquisition of the property of others and the losses consequent upon the purchase of such property when it is reclaimed by the rightful owners.

The Act of 1949 is a reasonable and legitimate exercise of the police power of this state, and the provisions and requirements of the Act tend toward the accomplishment of its avowed object and purpose, i. e., "for the identification of livestock and the prevention of livestock theft." Such object and purpose is one for which the police power may rightly be exercised, namely, the general welfare of the people of the state. The Act of 1949 is, in short, merely a more modern implementation of the too often ignored Mosaic mandate that "Thou shall not covet thy neighbor's ox * * * nor his ass."

■ If an act may be sustained only in the event that circumstances exist which justify its adoption as a reasonable exercise of the police power, the existence of such circumstances will be presumed. *City of Portland v. Stevens,* 180 Or. 514, 527, 178 P. 2d 175; *Borden's Farm Products Company, Inc., v. Baldwin,* 293 U. S. 194, 209, 79 L. Ed. 281, 55 S. Ct. 187; 11 Am. Jur., Constitutional Law, 794, § 131.

Finding that the Act of 1949 is not intended to impinge upon interstate commerce, we now turn to an examination of the court's decree to determine whether or not it conforms to what we have hereinbefore said. It will be recalled that among other provisions of the decree was this:

"* * * Livestock brought into Oregon from other states and foreign countries for *immediate slaughter* and such livestock purchased for *immediate slaughter* at Portland Union Stockyards or elsewhere *while in interstate commerce* are not sub-

ject to the brand inspection requirements of Chapter 193, Oregon Laws 1949 * * *." (Italics ours.)

■ We here reiterate that the Act applies only to shipments originating within the state of Oregon, and, therefore, reference to shipments brought into the state of Oregon from other states is irrelevant. We next point to the words "immediate slaughter." They appear to be gratuitously used, for nowhere in the Act of 1949 can we discover a phrase or its equivalent which would justify such a limitation on any livestock shipment.

It follows that the decree before us should be modified to provide that the brand inspection requirements of Chapter 193, Oregon Laws 1949, apply only to livestock which are a part of shipments originating in Oregon, not specifically excepted by the terms of the Act.

Nothing herein said shall be construed as a limitation upon any right or power which now exists under any other law of this state designed to prevent the theft of livestock or the recovery of stolen stock or the punishment of those responsible therefor.

The views we have expressed render it unnecessary to consider the other interesting questions discussed by counsel.

The decree is affirmed with modifications as directed.

## APPENDIX

### Oregon Laws 1949, Chapter 193

#### "AN ACT

"Providing for the identification of livestock and the prevention of livestock theft; providing penalties; re-

pealing chapter 404, Oregon Laws 1947; providing a separability clause; and declaring an emergency.

"Be It Enacted by the People of the State of Oregon:

"Section 1. This act shall be known and may be cited as the livestock identification and theft prevention act.

"Section 2. Words and phrases used in this act, unless otherwise required by the context, shall be deemed to have the following meaning:

"1. 'Livestock' means all cattle, horses, mules and asses.

"2. 'Department' means the department of agriculture of the state of Oregon.

"3. 'Director' means the director of the department of agriculture of the state of Oregon.

"* * *

"6. 'Brand inspector' means a person appointed pursuant to the provisions of this act to inspect livestock as to brands.

"7. 'Brand inspection' of livestock means the examination of such livestock by a brand inspector for brands, tags, flesh marks or earmarks, dewlaps, wattles, color, sex, age or any other form of identification.

"* * *

"14. 'Common carrier' means any person who transports for hire or who holds himself out to the public as willing to transport for hire, compensation or consideration by rail, motor vehicle, boat or aircraft from place to place, persons or property, or both, for those who may choose to employ him.

"* * *

"17. 'Transported', 'transporting' and 'transportion' refer to and mean any movement of livestock whether by common carrier, contract carrier, private carrier or on the hoof, except:

"(a) Movement by the owner or person in lawful possession of livestock when drifted, herded or trailed

to or from pasture or range in the regular course of ranch operation, where no change of ownership, right or interest is involved.

"(b) Movement by the owner or person in lawful possession of horses for handling, herding or trailing livestock, or for racing, showing, displaying or exhibiting the same and return when no change of ownership, right or interest is involved or contemplated; provided, however, that any person moving horses for racing, showing, displaying or exihibiting shall have with him at the time of so moving them evidence of ownership or right to possession of such horses.

"18. 'Transportation certificate' means a certificate signed by the owner or person in lawful possession of the livestock to be transported, on a form to be approved by the department, disclosing the owner, designating the point of origin and the point of destination of such transportation, describing by marks, brands or other identifying characteristics the livestock to be transported and including a form for bill of sale and such other information as the department may prescribe.

"19. 'Brand inspection certificate' means a certificate signed by a brand inspector and, unless the livestock inspected be accompanied by a transportation certificate signed by the owner or person in lawful possession thereof, countersigned by the owner or person in lawful possession of the livestock at time of inspection, on a form approved by the department, carrying a description of the marks, brands or other identifying characteristics of the livestock inspected, reciting that the brand inspector has inspected all such livestock shown thereon and that to the best of his knowledge the person presenting such livestock for inspection is in lawful possession thereof and is authorized to move such livestock from a specified point of origin to a specified point of destination, and including such other information as the department may prescribe.

"* * *

"Section 7. 1. Livestock transported from any point in the state of Oregon, regardless of final destination, must be inspected before leaving the state of Oregon and must be accompanied by a brand inspection certificate; provided, however, that when the transportation of livestock originates at a point in the state of Oregon where no brand inspector is available, such transportation may be authorized by a transportation certificate to the nearest point en route in the state of Oregon where a brand inspector is available, whereupon such livestock shall be promptly inspected, the transportation certificate accompanying the same shall be surrendered to the brand inspector, and a brand inspection certificate shall be prepared which must accompany the livestock to final destination. Should the identical livestock so transported to or through a point outside of the state of Oregon be returned to said state without unloading en route, and in continuation of the same shipment or movement, and if no change of ownership has occurred or is involved, and if such movement constitutes a normal ranch operation of the owner of such livestock, such owner shall be entitled to a refund of the brand inspection fees paid by him in connection with such movement, on a form of affidavit to be provided by the department. Such affidavit shall contain such information as shall be required by the rules and regulations referred to in section 6 of this act. Upon the receipt of such affidavit and claim, the director shall make the refund to which the claimant is shown to be entitled, payment of which shall be made from the brand inspection account.

"2. Livestock transported from a place within this state to a range outside this state and returned to a place within the state of Oregon after movement therefrom shall be inspected as to brands before removal from the state of Oregon; provided, however, that if such livestock be returned to a place within the state of Oregon within eight months from date of origin of movement from this state, the owner or person in lawful possession thereof may apply to the department for a refund of one-half of the fee for such

brand inspection. Application for such refund shall be made to the department, on forms supplied by the department, within 30 days after the return of such livestock to the state of Oregon, and shall be accompanied by certificates of brand inspection issued upon removal of such livestock from this state and certificates of brand inspection, if any, issued by any other state, authorizing the return of said livestock to the state of Oregon. In addition, the applicant for such refund shall attach his affidavit declaring that the animals described in the Oregon brand certificate as to which a refund is requested were moved to such other state and returned to Oregon on respective dates stated, and are the identical animals described in the brand certificate issued by such other state. Upon proof so established the director shall make the refund to which the claimant is shown to be entitled, making payment thereof from the brand inspection account.

"3. (a) Livestock transported, the destination of which is any slaughterhouse, packer, stockyard, livestock auction market or market agency within the state of Oregon, shall be accompanied by either a brand inspection certificate or a transportation certificate. If accompanied by a transportation certificate only, a brand inspection must be made and a brand inspection certificate must be issued at the point of destination.

"(b) Livestock transported from any of the places or agencies designated in this section, following brand inspection therein, destined to a slaughterhouse within this state or to a point outside of this state, may be so moved when accompanied by a duplicate brand inspection certificate, which shall be issued free of charge. Other livestock may be transported from places or agencies mentioned in this section accompanied by a transportation certificate executed by the owner thereof or his duly authorized agent.

"4. Subject to the provisions of subsection 5 hereof, all livestock transported in any manner must be accom-

panied by a transportation certificate or a brand inspection certificate, as the case may be, and, when a change of ownership is involved, by a bill of sale, to be signed by the person parting with ownership of the livestock or by his duly authorized agent.

"5. Except as provided in subsection 1 of this section, the provisions hereof requiring the issuance of transportation certificate or brand inspection certificate shall have no application to movements governed by subparagraphs (a) and (b) of subsection 17 of section 2 of this act.

"Section 8. 1. The owner or person in lawful possession of livestock, upon presenting the same for brand inspection, must submit proof of ownership thereof. Proof of ownership may be established by the record brand, bill of sale, affidavit or other means approved by the department.

"2. Before issuing a certificate of brand inspection the brand inspector shall satisfy himself as to the ownership of the livestock so inspected. He hereby is empowered to seize, hold, unload for inspection, or otherwise prevent the movement of any and all livestock the true ownership of which is in question. He may refuse to issue a brand inspection certificate for out-of-state shipment of such livestock until proof of ownership thereof is established. When in doubt as to ownership of livestock he may permit the sale thereof and impound the proceeds of such sale. In such case the proceeds of sale remaining after paying all costs of sale and charges therewith connected shall be transmitted to the department of agriculture and shall be held in a suspense account in the department of agriculture account in the state treasury for three years, subject to claim and proof of ownership of such proceeds by the true owner of the livestock so sold. Such proceeds shall not be subject to tithing or in any other manner be treated as moneys of the department. If the owner thereof be not found within three years, the clear proceeds of such sale shall be paid to the state treasurer for deposit in the irreducible school fund.

"Section 9. Brand inspection certificates and transportation certificates shall be issued in such duplication, and such disposition of the copies thereof shall be made, as required by the provisions of this act and the rules and regulations hereunder promulgated.

"Every carrier subject to the provisions of section 11 of this act shall be entitled to receive and retain one copy of each transportation certificate and one copy of each brand inspection certificate required by such section.

"Section 10. Brand inspectors, at the time of inspecting livestock as to brands, shall take up transportation certificates accompanying such livestock, and as soon as conveniently possible thereafter, not to exceed six months in any event, shall deliver such certificates to the sheriff of the county wherein the shipment originated and such sheriff shall retain the same as permanent records.

"Section 11. It shall be unlawful for any common carrier, contract carrier or private carrier to transport any livestock without receiving such brand inspection certificate or transportation certificate and any such carrier that violates this provision of the act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined as hereinafter provided, and shall be liable for all damage to any person thereby injured, in the amount of such damage, costs and attorney's fees.

"" * * *

"Section 14. Every person who shall knowingly make any false certificate, affidavit or bill of sale or make or induce any false inspection, or who shall certify to any material fact required by this act to be set forth in any of such certificates, affidavit or bill of sale knowing the same to be untrue, shall be deemed guilty of a violation of this act and shall be subject to its penalties.

"Section 15. A fee to be fixed by the department, of not more than 25 cents per head, shall be charged

for brand inspection in this state. Such fee shall be paid by the person at whose instance the brand inspection is made.

" * * * *

"Section 17. The operators of all stockyards, slaughterhouses, packing plants and livestock auction markets shall be responsible for the collection of brand inspection fees at such places, respectively, except when brand inspection certificates accompany the livestock to such places, and they shall promptly pay over and deliver to the brand inspector making inspection at such places all brand inspection fees so collected by them.

"Section 18. No person operating any slaughterhouse, stockyard, packing plant, livestock auction market or similar establishment shall sell or slaughter or permit the sale or slaughter of any livestock in or through such establishment until such livestock shall have been inspected by a brand inspector of this state. Every such person shall keep or cause to be kept a copy of the certificate of brand inspection of such livestock for a period of one year next succeeding the date of issuance thereof and shall make such certificate available for inspection by representatives of the department.

" * * * *

"Section 20. The department hereby is directed and empowered to apply to the secretary of agriculture of the United States for authorization to charge and collect fees in stockyards subject to the jurisdiction of such secretary, for the inspection of brands and other identifying characteristics of livestock originating in, or shipped from, the state of Oregon, for the purpose of determining the ownership of such livestock, as provided by section 217a, 7 U. S. C. A., also to register as the market agency of the state of Oregon for such purpose, and to do all other things necessary or advisable in conformance with said section 217a, for the protection of livestock and the prevention of livestock theft.

"Section 21. Any person who violates any of the provisions of this act shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than five hundred dollars ($500) or by imprisonment in the county jail for a period of not to exceed six months, or by both such fine and imprisonment.

"* * *

"Section 23. That chapter 404, Oregon Laws 1947, be and the same hereby is repealed."

Appeal from Circuit Court, Multnomah County.

WALTER L. TOOZE, Judge.

ON PETITION FOR REHEARING

*George Neuner,* Attorney General, and *Catharine Carson Barsch,* Assistant Attorney General, of Salem, and *Blaine Hallock,* of Baker, for the petition.

*Hart, Spencer, McCulloch, Rockwood & Davies,* and *Manley B. Strayer,* of Portland, contra.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK, LATOURETTE and WARNER, Justices.

PETITION DENIED.

WARNER, J.

The appellant has filed a petition for rehearing.

The basic reason asserted in justification for the petition seems to spring from a fallacious premise that our previous opinion appears to endow livestock, which have been imported into Oregon, with a continuing immunity from the operation of the brand inspection law. This thought is reflected by several different statements found in the petition but perhaps more succinctly in petitioner's question: "Does livestock not become part of the mass of property within this state, as do

other subjects of commerce, when the interstate shipment thereof is ended and the animals come into the possession of Oregon owners?''

We do not think that the reasons assigned for that query, nor the query itself, are warranted by any language found in the original opinion.

It is not always easy to determine the exact moment when any given shipment in interstate transport comes to an end or its final place of rest. It is, nevertheless, a matter of common knowledge that all interstate shipments eventually reach a terminal point, that is, a place where their interstate character and incident immunities from state interference and control are immediately and completely lost and where the shipment, by the same token, becomes immediately and completely responsive and liable to any nondiscriminatory local laws appropriately relating to it. Such is true of any livestock coming into this state from without its boundaries by any means of transport. When we use the term ''final place of rest,'' we have no reference to that type of temporary rest or momentary interruption in the continued flow of commerce which sometimes gives the commodity a temporary situs sufficient to make it liable to assessment for taxation under local tax laws. See *Stebco Inc. v. Gillmouthe,* 189 Or. 427, 221 P. 2d 914; *Binderup v. Pathe Exchange Inc.,* 263 U.S. 291, 311, 68 L. Ed. 308, 44 S. Ct. 96.

Concerning § 7 of the Act, we said in our previous opinion: ''All of the occasions and circumstances demanding brand inspection are comprehended within its terms.'' We there demonstrated that the livestock vulnerable to brand inspection are those which are part of any shipment originating in Oregon. We also said: ''In them [the provisions mandating the use of transporta-

tion certificates] is found the emphasis *on the origin
of the shipment in Oregon* which is the key that opens
the door to our understanding and also becomes the
crucial test of the right to make a brand inspection
under the Act.''

■ If livestock previously imported into this state
are later to become a part of any *shipment originating
in the state of Oregon* (§ 7, Act of 1949), it necessarily
implies that at some prior time, subsequent to their
entry into the state, they had ceased to be in the flow
of interstate commerce and had become a ''part of the
mass of property within this state.'' They cannot be-
come a part of a new or original shipment *beginning
in Oregon* and at the same time be in the stream of the
interstate commerce movement which brought them to
this state.

■ The concept of a shipment originating in this
state is incompatible with the concept of the continuity
of a previous status in interstate commerce. It is the
character of the movement in transport, i.e., a move-
ment *from a place in Oregon,* which exposes the
livestock moved to brand inspection under the Act of
1949 and not any peculiar classification of the animals
so moved, i.e., as to whether they were raised in Oregon
or had been previously shipped or brought into Oregon
from other states. Therefore, in any of our phrases
reading in substance, ''the only livestock amenable to
brand inspection under the Act of 1949 are those which
are a part of shipments originating in the state of Ore-
gon,'' it becomes unnecessary to emphasize an obvious
corollary by an irrelevant phrase such as ''including
those which had previously come into this state from
points outside of Oregon.'' This is especially true when
nothing within the Act nor in our previous opinion

suggests that an immunity from brand inspection can be successfully claimed for imported animals which later become a part of a shipment or transportation originating in this state. Their immunity from inspection under the Act continues only so long as they are still in the flow of interstate commerce movement which brought them into this state.

It is the protection of Oregon-owned cattle that has commanded the interest of the legislature regardless of how or where such ownership was acquired. The over-all objective of the Act is to prevent by brand inspection shipments of stolen cattle from this state to places beyond its borders and to intercept before slaughter the transportation of such cattle from places within Oregon to slaughterhouses and like institutions in the state.

■ Once an imported animal has come to a place of final rest in the state of Oregon, in the sense that the flow of interstate commerce has ceased, and thereafter becomes a part of a new shipment or transportation which originates in this state, it is liable to brand inspection under the Act. A brand inspector exercising such authority has only to be sure that the first movement, i.e., the interstate movement into the state, has ended and that the second movement, i.e., one contemplated by § 7 of the Act, has begun. Once that determination has been correctly made, brand inspection is in order; and this can be done as to such cattle, if not previously inspected under the Act, at any Oregon slaughterhouse, stockyard, packing plant, livestock auction market or similar establishment before such livestock are sold or slaughtered.

■ As we have hereinbefore suggested, the determination of when a movement in interstate commerce

ends is not always an easy matter. It has been stated that "each case must be decided upon the facts as they appear in the case." *Chicago & Eastern Illinois Ry. v. Public Service Commission of Indiana,* 205 Ind. 253, 186 N.E. 330 (writ of certiorari denied in 290 U.S. 688, 78 L. Ed. 592, 54 S. Ct. 123). Also see *Public Utilities Commission v. Landon et al.,* 249 U.S. 236, 245, 63 L. Ed. 577, 39 S. Ct. 268, where it is said: "Interstate commerce is a practical conception and what falls within it must be determined upon consideration of established facts and known commercial methods." One reason for this is probably found in the fact that the intent of those engaged in interstate commerce largely determines where the commerce ends. *Baltimore & O. S. W. R. v. Settle et al.,* 260 U.S. 166, 67 L. Ed. 189, 43 S. Ct. 28; 15 C.J.S., Commerce, 296, § 25, and annotations to note 64. Also see *Binderup v. Pathe Exchange Inc.,* supra, 263 U.S. 309, reading:

"* * * The general rule is that where transportation has acquired an interstate character, 'it continues at least until the load reaches the point where the parties *originally intended* that the movement should finally end.' Illinois C. R. Co. v. De Fuentes, 236 U.S. 157, 163, 59 L. ed. 517, 519, P.U.R. 1915A, 840, 35 Sup. Ct. Rep. 275 * * *." (Italics ours.)

The petitioner claims some confusion because we have frequently employed the word "shipment" and "shipment of livestock" in our previous opinion and suggests that the word "transportation," as defined by the Act, would be a better substitute. In support, he categorically asserts "we do not find the word 'shipment' appearing anywhere in the Act." We, however, have no misgiving that others will experience the same confusion or fail to recognize that "shipment," as used by us in this and in our previous

opinion, includes within the comprehensive ambit of its meaning all methods of movement contemplated by the Act of 1949, i. e., by common carrier, contract carrier, private carrier or on the hoof (§ 2, subsection 17). The word "shipment" as thus applied by us finds justification in the Act itself where, notwithstanding petitioner's statement to the contrary, it appears many times and as a part of phrases reading "for sale or shipment" (§ 2, subsection 10); "shipment or movement" (§ 7, subsection 1); "out-of-state shipment of such livestock" (§ 8, subsection 2); and "the county wherein such shipment originated" (§ 10). Also see § 20 wherein we find "livestock originating in or shipped from," and § 12, subsection 2, reading, "owner or shipper of said livestock."

The petition is denied.