No. 14,799.

HERSHORN *v.* THE PEOPLE.
(113 P. [2d] 680)

Decided May 12, 1941.

Mr. E. V. HOLLAND, Mr. J. P. CONSTANTINE, for plaintiff in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. GERALD E. McAULIFFE, Assistant, Mr. Gail L. IRELAND, Attorney General, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE OTTO BOCK delivered the opinion of the court.

PLAINTIFF in error Hershorn was charged jointly with Alexander Johnson and the Tivoli Terrace Night Club, Inc., with the unlawful sale of intoxicating liquor. The information, filed in the district court of Denver, omitting the formal parts, reads as follows:

"That on the twenty-third day of October, A.D. 1939, at the City and County of Denver, and State of Colorado, Tivoli Terrace was a corporation of which Hyman Hershorn was President, and in which Alexander Johnson was a waiter; that on the said twenty-third day of October, A.D. 1939, Hyman Hershorn and Alexander Johnson, and the said Tivoli Terrace Night Club, Inc., did sell spirituous liquor, to-wit, whiskey, to Archie Miller, who was then and there under the age of twenty-one years, and, to-wit, of the age of nineteen years; * * *

"Second Count: * * * That * * * on, to-wit the twenty-third day of October, A.D. 1939, Tivoli Terrace was a corporation of which Hyman Hershorn was President, and in which Alexander Johnson was a waiter; that on the said twenty-third day of October, A.D. 1939, Hyman Hershorn and Alexander Johnson, and the said Tivoli Terrace Night Club, Inc., a Corporation, did sell spiritu-

ous liquor, to-wit, whiskey, to Archie Miller, who was then and there an intoxicated person."

Hershorn, tried jointly with Johnson, was convicted on both counts, fined the sum of $500 and sentenced to the county jail for a period of sixty days on each count, the sentences to run concurrently. Johnson also was convicted, but Hershorn only is here by writ of error seeking a reversal of the judgment. Subsequent to the Hershorn trial, the Tivoli Terrace Night Club, Inc., was by the trial court, upon the same facts, found guilty upon both counts.

Since Hershorn is the only plaintiff in error here, a statement of facts appearing from the evidence upon which the jury returned its verdicts against him will suffice for the purposes of this review, it being assumed that the jury adopted that evidence, or any reasonable inferences therefrom, which supports its verdicts. *Bunch v. People,* 87 Colo. 84, 285 Pac. 766. October 23, 1939, and for some time prior thereto, Hershorn was president and general manager of the Tivoli Terrace Night Club. All employees of the club, numbering about thirty-four persons, were hired by him. Food and liquors were served, and entertainment and dancing provided patrons until 2 o'clock a.m., except on Saturdays, when the closing time was midnight. Hershorn had general control of the policies of the night club, managed the same, supervised the activities of all of its employees, and was considered to be "the boss" of the place. When he was absent, which was not often, an acting manager, under his supervision and control, was in charge. A special officer was hired by Hershorn, whose duty it was to watch the place generally and act as Hershorn's chauffeur, his special duty being to keep order and to refuse admittance to minors. When there was any controversy with patrons concerning the payment of bills, this officer tried to talk them into paying, and if that failed, he called the police, who were very cooperative. He was so employed by Hershorn in that capacity for about five

years prior to October 23, 1939. It was not his practice to inquire as to a patron's age, because that would hurt the business. Hershorn hired seven hostesses at a guaranteed salary of $18 per week, which was paid on a commission basis, and was dependent upon the amount of liquor sold to patrons, the commissions being ten cents per drink for whiskey and seventy-five cents per bottle for champagne. Hostesses, in order to stimulate the sale of liquor, were required to entertain patrons of the club while there, and it was the fact that customarily drinks served to hostesses at the expense of patrons contained a considerably less quantity of intoxicating liquor than those served to patrons, but the price of drinks was on the same level, whether served to hostess or patron. It also was the custom that when a person purchased more champagne than he could drink, hostesses or entertainers were permitted to participate in its consumption. Waiters also were paid on a commission basis. The earning power of the hostesses and waiters depended primarily upon the quantity of liquor sold. The booths in which patrons were served were kept moderately dark, so that it would be difficult for individuals, except those in immediate attendance, to observe ages or the degree of sobriety of patrons. Taxi drivers who brought patrons to the night club were paid one dollar per patron. Johnson, who was the head waiter and who served the minor, Archie Miller, on the night of October 23, 1939, and who served all the drinks consumed at that time, testified, "They tell me to serve no one that seems to be very drunk." That Hershorn not only was aware of all these practices, but that they were carried on under his direction and supervision, clearly is reflected in the record. He testified that he had given instructions not to sell liquor to minors or to individuals who were intoxicated, and that on the night of the transaction in question he left the club at 8:30 p.m. The minor, Miller, did not arrive until 9:15 p.m. and left about 1:30 a.m. There is no doubt from, or conflict in,

the evidence, as to his age, which was nineteen years. He came to Denver from Nebraska, where he had been living on a ranch with his father, the day prior to his visit to the night club, for the purpose of entering the Opportunity School and seeking employment. In Denver he was living at the home of his brother, who was employed at the Denver Union Station. When he entered the night club he was sober. He seated himself at a table and ordered a Tom Collins, which consists in part of spirituous liquors. After he had consumed this drink a hostess joined him. After each had consumed six scotch-and-sodas, chicken dinners were ordered. Following the dinner Miller was presented with a bill in the amount of $8.95 for drinks and dinners, which he paid. This was about 11:30 p.m. He then drank six more scotch-and-sodas and, with other hostesses and entertainers, consumed three bottles of champagne. He testified that once during the evening, while going to the lavatory, he stumbled and fell; that he felt numb, that his vision was blurred, and that he had no recollection of ordering champagne. The hostess whom he first met after entering the club remained with him until he was taken home, about 1:30 a.m. The inference to be drawn from her testimony is that she ordered and consumed a drink each time Miller did; but she also stated, "all my drinks were diluted a lot weaker than his." Shortly before he left he was presented with an additional check in the sum of $38.30, which did not include any of the items of the first check which he had paid. It then was discovered that he did not have sufficient funds to pay the bill. A police officer was called, but during the interim the special officer called Miller's brother by telephone and was by him informed that Archie Miller was a minor. Thereafter the special officer took Miller into the kitchen of the club, where the police officer was waiting, who inquired of Miller, "How about this bill, fellow?" and some talk ensued about having the minor thrown into jail as a vagrant.

Thereafter the special officer of the night club, whose duty it also was to take intoxicated patrons home in a motor vehicle, took Miller to the residence of his brother. Upon reaching there the special officer still talked about placing the minor in jail, and under these circumstances the brother signed his, as well as the minor's, name to the bill for $38.30. The following day the brother reported the matter to the proper police authorities, and an investigation took place that morning, at which time Hershorn and a number of the night club employees were questioned. The following day Hershorn went to the brother's home and endeavored to persuade him and his wife to drop any prosecution they may have had in mind, on the promise that they would not be held responsible for the bill; that the money which the younger brother had spent at the Tivoli Terrace Night Club would be returned, and that he would give the Millers "$50 as a gift, not as a bribe, but as a gift, to drop the case."

The information is based upon section 3(b), chapter 142, '35 S.L. ('35 C.S.A., c. 89, §17[b]), the pertinent part of which reads as follows: "It shall be unlawful to sell * * * spirituous liquors to any person under the age of twenty-one (21) years, or * * * to an intoxicated person."

 The errors upon which Hershorn relies for a reversal primarily relate to instructions tendered and refused and to instructions given by the court to the jury. The crux of this controversy relates to the interpretation of the above-quoted section. Counsel for Hershorn contend that a proper construction requires that the offenses charged must be committed with knowledge and intent to violate, and they urge us to read into the section the word "knowingly," so that only persons who *knowingly* sell spirituous liquors to minors or intoxicated persons would be punishable thereunder. In other words, they insist that there must be evidence of criminal intent, and that the jury must be so instructed. This

argument is made only on behalf of Hershorn, who was not present when the offenses charged were committed.

The theory of the prosecution, as it applies to Hershorn, is set out in given instruction No. 10, which reads as follows:

"You are instructed that a corporation can only act through its agents, officers, or employees; and you are further instructed that if you find from all of the evidence beyond a reasonable doubt that on October 23, 1939, the Tivoli Terrace Night Club, Inc., was a corporation; that Hyman Hershorn was president and general manager of the corporation, and that as such president and manager the said Hyman Hershorn had general control and direction of the policies of said corporation, and managed, directed and supervised its employees; and if you further find from the evidence beyond a reasonable doubt that there was a violation or violations of the liquor laws, as defined elsewhere in these instructions, by the defendant Johnson while acting as an agent or employee of said corporation, and within the general scope of his employment, then you are instructed that the defendant Hershorn is responsible for such violation or violations of the liquor law, and your verdict should be that of guilty as charged in the information.

"If you do not so find the facts, or if you have a reasonable doubt with regard to any of the matters as hereinabove outlined, your verdict should be that of not guilty."

If this instruction correctly states the law, and we think it does, the evidence fully sustains the verdicts. That the lawmaking body may make a prohibited act a crime, irrespective of the elements of intent or scienter, cannot be questioned. This legislative power is frequently exercised from necessity. Wharton on Criminal Law (11th ed.), vol. 1, section 113. From the laboratory of criminal jurisprudence we learn that when public policy requires, the legislature may prohibit certain conduct as unlawful, independent of any criminal in-

tent or negligence. One of the leading cases which supports the theory of the prosecution in the instant case is *Commonwealth v. Mixer*, 207 Mass. 141, 93 N.E. 249, 31 L.R.A. (N.S.) 467. In this case the offense involved was the unlawful transportation of intoxicating liquors. We quote from the opinion as follows: "In the prosecution of crimes under the common law apart from the statute, ordinarily it is necessary to allege and prove a guilty intent, and as a general principle a crime is not committed if the mind of the person doing the act is innocent. An evil intention and an unlawful action must concur in order to constitute a crime. But there are many instances in recent times where the legislature in the exercise of the police power has prohibited under penalty the performance of a specific act. The doing of the inhibited act constitutes the crime and the moral turpitude or purity of the motive by which it was prompted and knowledge or ignorance of its criminal character are immaterial circumstances on the question of guilt. The only fact to be determined in these cases is whether the defendant did the act. In the interest of the public the burden is placed upon the actor of ascertaining at his peril whether his deed is within the prohibition of any criminal statute."

After citing numerous cases, including many relating to sales of intoxicants to minors by licensed liquor dealers, which come within the rule, and discussing others holding to the contrary, the Massachusetts court, speaking further through Justice Rugg, says: "Notwithstanding these considerations, we are not inclined to relax the rule so plainly laid down in many cases, nor to interfere with the policy of the legislature respecting the regulation of transportation and sale of intoxicating liquors. While the rule may seem harsh at first sight in some of its applications, this raises not a question of judicial construction but of legislative policy with which the courts cannot interfere so long as no constitutional guaranty is infringed. Although the severity of the rule

'has been criticized with inadequate understanding of the grounds for it' (*Commonwealth v. Regan,* 182 Mass. 22, 25 [64 N.E. 407]), they are pointed out with clearness by Holmes, J., in *Commonwealth v. Smith,* 166 Mass. 370, at 375 [44 N.E. 503, 504], in this language: 'When according to common experience a certain fact generally is accompanied by knowledge of the further elements necessary to complete what it is the final object of the law to prevent, or even short of that, when it is very desirable that people should find out whether the further elements are there, actual knowledge being a matter difficult to prove, the law may stop at the preliminary fact, and in the pursuit of its policy may make the preliminary fact enough to constitute a crime'."

 Ignorance or mistake as to minor's age, according to the majority rule, is no defense in a criminal prosecution for the sale of liquor to a minor. "Where, however, the prohibition against furnishing liquor to minors is couched in unqualified terms, the courts are not entirely agreed on the effect of ignorance, mistake, or belief as to the matter of age, although according to the majority view, it is, under such statutes, incumbent on the seller to know that his customer labors under no disability, and that an honest mistake or belief in the premises constitutes no defense, even when based on the minor's representations and appearance." 30 Am. Jur., pp. 427, 428, §328. What about Hershorn, who was not present and therefore had no knowledge of the particular transactions involved? He was the president and general manager of the night club. He it was who hired all employees, directed the policies of the corporation, and supervised its business activities. There is direct evidence, or evidence from which it may reasonably be inferred, that Hershorn was the Tivoli Terrace Night Club; that, screened by a corporate shell, it was his business, and that he was in complete control of everything that concerned the operation of the club. His attempt, the day after the commission of the offense, to persuade

the prosecuting witnesses for a monetary consideration to drop the matter, also fortifies the position that he held a controlling interest in the club. After hearing all of this evidence, only a credulous jury would have reached any other conclusion. The detailed practices of the night club, controlled and directed by Hershorn, left no other inference but that he dominated all of the affairs of the institution. "Under laws regulating sales of intoxicating liquors, the general rule is that a licensed dealer in intoxicating liquors is liable for an unlawful sale made by his agent or servant within the scope of his authority. * * * * "In general, a licensee may be convicted on proof of an unlawful sale of intoxicating liquor by an employee or bartender * * * on proof of a sale made within the scope of the employee's authority, express or implied, especially where the sale was made with the knowledge or consent of the employer." 30 Am. Jur., pp. 414, 415, §301. "An employer is criminally liable for sales of intoxicating liquor made by his clerk or employee in the ordinary line of his duty as such, but not for an unauthorized sale by a mere porter with menial duties only, or other employee not authorized to sell liquor at all." Ibid., p. 415, §302. We recognize that there is a conflict in the decisions involving this question. "It has been observed with reference to the conflict in the decisions upon the question of the culpability of the saloonkeeper that the cases holding in his favor proceed upon the theory that no one can commit a crime in the absence of any intent to do so, whereas decisions to the contrary are based upon the doctrine that in statutory crimes intent is not an ingredient of the offense unless there is incorporated into the legislative definition the element of knowledge on the part of the defendant." Ibid., p. 416, §303. We believe the latter theory reflects the legislative intent as expressed in section 3(b), supra. In reaching this conclusion we particularly have in mind the objects sought to be accomplished by the statutory regulation of the

liquor traffic. "According to many authorities, a liquor dealer is criminally liable for unlawful sales by his bartender within the scope of his employment, even when they are made in violation of express directions; the theory of these cases is that the statute places the responsibility of preventing illegal sales upon the licensee." Ibid., p. 416, §304. "It has been held that the fact that a sale to a minor was made by the defendant's agent or servant constitutes no defense, even, according to some authorities, where the sales are made in the defendant's absence and without his knowledge or authority, or where they are made contrary to express instructions. The same rule has been applied to the offense of * * * selling liquor to inebriates." Ibid., p. 417, §305. The prohibition under section 3(b), supra, is primarily directed against the employer or owner. Hershorn cannot, under the circumstances here disclosed, escape guilt by attempting to shift the crime to his employee, and must stand or fall with those who acted for him. So long as he has the management, direction and supervision of the business and place in which liquor was being sold he assumes the risk of criminal liability when his agents, working under the circumstances disclosed by the evidence here, sold liquor to minors or intoxicated persons. To hold otherwise would largely nullify section 3(b), supra. In the construction of a statute such as we have before us we must determine from the subject matter and the evil to be remedied whether the word "knowingly" or its equivalent is to be implied, or the statute enforced as written. *Wells Fargo & Company Express v. State,* 79 Ark. 349, 96 S.W. 189.

Counsel for Hershorn strongly rely upon the case of *Overland Cotton Mill Co. v. People,* 32 Colo. 263, 75 Pac. 924, to sustain their contention that the element of criminal negligence is necessary to support his conviction, and that the jury should have been so instructed. The case relates to the unlawful employment of a boy under the age of fourteen years in a mill by an assistant super-

intendent without the knowledge or consent of his superior who, because of his general authority to hire and discharge employees, was considered as not having exercised due diligence in ascertaining that the boy was working for the mill company, and his conviction, under such circumstances, was sustained. In that case we were concerned only with the question of whether the evidence would support the conviction, and held that it was sufficient. No instructions were involved; moreover, the offense was of a different character from that here under consideration and had no relation to the liquor traffic. While it has been held that a person cannot be condemned for an act of which he has no knowledge, we expressed the opinion in the Overland case that such holding does not apply where it is his duty to know. So in the instant case, it was Hershorn's business to hire and discharge employees, and any violation of the laws relating to the liquor traffic by such employees, if occurring in the course of their employment, was his responsibility. We said in the Overland case, referring to the superintendent who had no knowledge of the commission of the offense, "At most, his offense consisted of not strictly observing the law, rather than an intentional disregard of its provisions." The facts in the instant case are considerably stronger against Hershorn than were those against the defendant in the Overland case. Here, the evidence clearly shows, when all circumstances are considered, that Hershorn did not strictly observe the law. In fact, it must be said that under his direction the night club was so conducted as to encourage violations of the law. The jury would not have been justified in finding otherwise. The Overland case is readily distinguishable from the one at bar and, in a large measure, sustains Hershorn's liability.

Counsel for Hershorn cite also the case of *Blackett v. People,* 98 Colo. 7, 52 P. (2d) 389. In that case the concurring opinion by Mr. Justice Butler states the view of the majority of the court, and a proper distinction is

made between acts malum prohibitum and malum in se, in that the latter class always involves criminal negligence, while in the former mere negligence may suffice. In that case Mr. Justice Butler, referring to the Overland case, and quoting therefrom, said, as bearing upon the issue of the superintendent's liability: "As applicable to that situation, we used the following language: 'An agent of a corporation is presumed to have that knowledge of its affairs particularly under his control and management which, by the exercise of due diligence, he would have ascertained'."

We recognize that the authorities are in conflict on this question, but in our opinion, based upon the evidence as disclosed by the record, and as applied to Hershorn, the law was correctly stated in given instruction No. 10. This also is in harmony with the majority rule of appellate courts which have passed upon the problem. *Halsted v. State*, 41 N.J.L. 552; *McCutcheon v. People*, 69 Ill. 601; *People v. Roby*, 52 Mich. 577, 18 N.W. 365; *Wells Fargo & Company Express v. State, supra; People v. Rice*, 161 Mich. 657, 126 N.W. 981; *State v. Katz*, 122 Conn. 439, 189 Atl. 606; *State v. Schull*, 66 S.D. 102, 279 N.W. 241; *State v. Holm*, 201 Minn. 53, 275 N.W. 401. As to how the law is to be interpreted in its application to other or similar sections, or clauses in section 3(b), we express no opinion. Cases involving other questions must be decided as they arise. The measure of punishment is an element which enters into the construction of a law such as we have before us, and the difference in the mischief to be remedied may have a bearing upon such construction. To make unlawful the sale of intoxicants to minors and inebriates, regardless of intent, is a reasonable legislative regulation of the liquor traffic, so long as the proscribed act amounts only to a misdemeanor. If it were made a felony, a different question might be presented. Whether the punishment provided for a violation of section 3(b), supra, is excessive is a matter not before us.

In instruction No. 9, which relates to the sale of liquor to an intoxicated person, the trial court included the element of knowledge on the part of the defendant as necessary to convict. This, it is contended, by reason of its inconsistency with other instructions which omit this element, was error. Since in our opinion knowledge was not a necessary element to be established under either count of the information, the requirement of instruction No. 9, for a greater degree of proof on the part of the people than was necessary in order to convict, did not constitute prejudicial error.

The fact that the corporation was not tried jointly with Hershorn, although jointly charged, did not amount to prejudicial error, and no authorities are cited to the contrary.

Counsel for Hershorn assign error on the admission of people's exhibit G, which was the renewal of a motor vehicle operator's license card issued to the minor in the state of Nebraska September 12, 1939, showing him to be nineteen years of age. Miller testified that he used this card for the purpose of identification when questioned by the special officer at the time it was discovered that he did not have sufficient funds with which to pay the bill of $38.30. The testimony also discloses that this same exhibit, enclosed in a folder belonging to the minor, was lying on the table at the time he was being entertained by the hostess, who had testified that she saw some sort of card which gave his age as twenty-nine years. Its admission in evidence was not error.

Error also is assigned on the following question propounded by the district attorney on cross-examination of Hershorn: "I will ask you whether or not you were brought to the police department and investigated concerning the loss of eighty dollars in money?" This question was provoked by Hershorn's testimony on direct examination, wherein he stated that during all the time he had been in business there had been only two

complaints against him for violations of the liquor laws. We perceive no error.

In view of our conclusions, we deem it unnecessary to pass upon other questions raised.

The judgment is affirmed.

MR. CHIEF JUSTICE FRANCIS E. BOUCK, MR. JUSTICE YOUNG and MR. JUSTICE HILLIARD not participating.