**GORDON v. UNITED STATES.**

**TEMPKIN v. UNITED STATES.**

**DEVERICH v. UNITED STATES.**

**STONE v. UNITED STATES.**

Nos. 4531–4534.

United States Court of Appeals
Tenth Circuit.

Feb. 28, 1953.

Writ of Certiorari Granted June 1, 1953.

See 73 S.Ct. 1111.

---

John S. Boyden, Salt Lake City, Utah (Allen H. Tibbals, Salt Lake City, Utah, with him on the brief), for appellants.

H. D. Lowry, Salt Lake City, Utah, for appellee.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

These separate appeals are from judgments of convictions and sentences on an information containing four counts, three of which charged the appellants with violations of Section 601 of the Defense Production Act of 1950, 64 Stat. 798, 812, 50 U.S.C.A.Appendix, § 2131, and Regulation W, Title 32A, Code of Federal Regulations, Rev.1951, promulgated thereunder. The fourth count charged the defendants with a conspiracy to violate the same law and regulation.

With immaterial limitations, Section 601 of the Defense Production Act of 1950, supra, empowers the Board of Governors of the Federal Reserve System to exercise consumer credit controls in accordance with, and to carry out the provisions of Executive Order No. 8843, dated August 9, 1941, 50 U.S.C.A.Appendix, § 2131 note. Section 603 of the same act, 64 Stat. 798, 814, 50 U.S.C.A.Appendix, § 2133, provides that any person who wilfully violates any of the provisions of Section 601 or any regulation or order issued thereunder, shall upon conviction, be punished as therein specified. Section 2 of Regulation W, supra, promulgated under authority of the foregoing act, pertinently provides that each person engaged in the business of making installment sales is to be referred to as a "Registrant" and no such Registrant shall make or receive any payment which constitutes or arises directly or indirectly out of any credit extended by him except on conditions therein specified. And the section further provides that a Registrant must have a license which is thereby granted and he shall file a statement on a prescribed form with the Federal Reserve Bank or branch thereof in the district in which the main office of the Registrant is located.

Section 3(a) of the same regulation provides that there shall be a down payment on all installment sales of an amount not less than that specified for the article listed in Section 9 of the Regulation, such down payment to be calculated as therein specified.

Section 9 as it existed at times material here, provided that the down payment on sewing machines designed for household use shall not be less than 25% of the sale price thereof and that the loan value thereon shall not exceed 75% of such sale price.

Section 3(b) provides for the keeping of bona fide records of any transactions subject to the regulations and in accordance therewith.

Section 6(i) forbids a Registrant from extending any credit for financing the purchase of any listed article if he knows, or has reason to know, that there is, or that there is to be, any other credit of any kind extended in connection with such purchase beyond the amount of installment credit permitted by the regulation; but if the Registrant accepts in good faith a written statement signed by the obligor that no such other credit exists, then such statement shall be deemed to be correct for the purposes of the Registrant.

The first count in the information charged that Appellants, Allan Gordon and Eli Tempkin, doing business as National Stores, and Burt Deverich and Harvey Stone made an installment sale of a sewing machine designed for household use to Buean E. Colley, and that on the delivery of such machine such persons unlawfully, knowingly and wilfully accepted and received a down payment in an amount less than a sum equal to 25% of the sale price thereof in violation of Section 601 of the Defense Production Act and Regulation W promulgated thereunder.

The second count charged that the same persons unlawfully, knowingly and wilfully failed to make, complete and preserve bona fide records showing the amount of the purchaser's down payment in the installment sale of the machine to Buean E. Colley in violation of Section 601 of the Act and Regulation W.

The third count charged that the same appellants made an installment sale of a sewing machine to Evelyn Allen and extended credit knowing full well that other credit had been extended therewith so that the total amount of credit in connection with the sale exceeded 75% of the sale price of the machine in violation of the Act and Regulation, to which reference has been made.

The fourth count in the information charged that the appellants conspired to violate the Act and Regulations by making the sale of the sewing machine to Evelyn Allen as alleged in count three of the information.

Appellants do not challenge the sufficiency of the three substantive counts to state an offense. It is suggested however that the conspiracy count fails to state the requisite overt act, and appellants excepted to the court's instruction that the overt act consisted of the sale of the machine to Evelyn Allen. The point is not included in the statement of points relied upon, nor is it argued in the briefs. But since it does go to the validity of the count, we notice it only to say that the conspiracy charge was restricted to the sale of one machine to Evelyn Allen and that sale necessarily constituted the overt act. The court accordingly instructed the jury, and we think correctly so.

Each of the appellants challenges the sufficiency of the evidence to support the verdict of guilty on any and all of the counts in the information.

There was substantial and creditable evidence to the effect that appellants Gordon and Tempkin were engaged in the business of selling new and used sewing machines as a partnership under the name of the National Stores; that they first opened a store in Los Angeles, California and later one in Salt Lake City, Utah, where the sales laid in the information were made; that in the operation of that business they engaged salesmen who sold the machines to customers answering newspaper and radio advertisements offering the sale of rebuilt Singer sewing machines. The sales were made on the installment basis, the salesmen

retaining a certain percentage of the sale price, depending upon the amount received for a particular machine.

In support of counts one and two, there was evidence that a Mr. Tempkin sold Mrs. Colley a sewing machine for a total sale price of $149.95. The conditional sales agreement signed on the date of the sale showed a down payment of $38.95, but the Colleys actually paid Tempkin the sum of $1.00 to hold the machine until the next pay day, at which time Mr. Colley paid the sum of $15.00 and the machine was delivered to him. Thereafter he made additional payments on the down payment at the store for which he was given receipts. He received "dunning" notices from the National Stores showing the balances due on the down payment and soliciting additional payments. A total of $22.95 was paid on the down payment.

In support of count three there was evidence that about the time laid in the information a salesman for the National Stores sold Evelyn Allen a sewing machine for $149.95; that upon delivery of the machine the salesman was paid the sum of $13.00 on the required down payment of $38.95. At the same time Evelyn Allen signed three "I.O.U's" each promising to pay $6.50, to be remitted in envelopes addressed to the company with the salesman's name on the inside. Three American Express Company checks made payable to the salesman or to the National Stores were mailed in the company envelopes left with her for that purpose. The other payment was personally solicited and collected by the salesman. There was evidence to show that the obligation for the balance of the down payment was to the salesman alone.

There was evidence of a number of other sales of sewing machines in which less than 25% of the sale price was paid down and "I.O.U's" taken for the balance of the down payment. One salesman testified that he made about fifty sales and that in about 80% of them he took "I.O.U's" for the down payment; that these "I.O.U's" were turned into the company office and treated as cash as far as the company was concerned; that he was paid the full amount of his commissions irrespective of the down payments.

He testified that the salesmen were told to procure the 25% down payment but to accept an "I.O.U." for it if they could not get it otherwise. The evidence of these transactions was offered and received to show a course of conduct or design and purpose to commit the offenses charged in the information.

The record shows that the appellant Deverich was at one time manager of the Salt Lake City store and that a "Burt D." sold a sewing machine to Mrs. Elda Evans for which less than the required down payment was received. The government contends that appellant Deverich made the sale.

There was also evidence to the effect that appellant Stone was at one time manager of the Salt Lake City store, and while acting as such manager, he attempted to enforce the collection of the balance of a down payment on a sewing machine sold to a Mrs. Thelma C. Maxwell. But the information does not charge a sale of a sewing machine to either Evans or Maxwell, and there is nothing in the record tending to show that either Deverich or Stone was manager of the store when either of the sales laid in the information was made, that they were connected with the company, or in any way participated in or had knowledge of such sales. It follows that the judgment of the court as to those appellants must be reversed.

Appellant Eli Tempkin was never identified as the Tempkin who sold the machine to Mrs. Colley named in the first and second counts of the information. The receipt for the $1.00 deposit made by Mrs. Colley on the sale laid in the first count of the information bears the signature of what appears to be "E. Tempkin" and a Mr. Tempkin signed a conditional sales contract in the presence of Mrs. Colley, but the signature on the contract is "obliterated". There were two Tempkins connected with the organization, the appellant Eli Tempkin, and a Mr. Irving Tempkin. There was no attempt on the part of the government to identify for the record which of the Tempkins actually made the sale to Mrs. Colley.

The record indicates that appellant Gordon lived in Los Angeles, California and that he came to Salt Lake City two or three times to attend sales meetings and to make sales talks. There was no proof that he participated in or had actual knowledge of any of the sales laid in the information or any other sales shown in the record to have been made without the required down payment. Indeed, the sales contracts introduced in evidence show the receipt of the full amount of the required down payment, and the duplicate deposit slips showed that the amount of the down payment had been deposited in a Salt Lake City bank. Similar contracts, duplicate bank deposit slips, and evidences of like transactions all showing the full payment of the down payments and their deposit in a Salt Lake City bank, were mailed daily to the Los Angeles store for records there. There is no direct or positive proof that either Gordon or Tempkin made, participated in, or had actual knowledge of either of the sales laid in the information or that an incorrect record had been made of either of the transactions. There is no explanation for the irreconcilable inconsistencies between the evidence of numerous sales where the required down payment was not collected and the records showing the collection and deposit of the down payment. Either the records were wrong or the testimony was false. If the testimony of the salesmen and the customers is to be credited—a matter within the province of the jury—it is a permissible inference that the records of the company were manipulated to cover up the unlawful transactions. There was no evidence of who actually made the records reflecting the transactions but they were undoubtedly made and maintained in the regular course of business and accepted in evidence as such.

But the case was not submitted to the jury on the question of whether the partners had actual notice of the transactions. Instead it was tried and submitted to the jury on the theory that knowledge of one partner regarding the transactions was "imputable, attributable and chargeable" to the other, and that the knowledge and acts of the salesmen who made the sales and kept the records in counts one, two and three, while acting in the course of their employment, were imputable and chargeable to their employers Gordon and Tempkin. The effect of this instruction was to hold one partner criminally responsible for the acts of the other and both partners for the acts of their employee salesmen while acting in the course of their employment.

Since, as we have seen, there is no direct or positive proof that Eli Tempkin made the Colley sale, we have no need to consider whether as a matter of law his partner Gordon would be criminally responsible for his acts, for the conviction of neither of them can stand on that proof. We have then to consider the very perplexing question whether the partners can be held criminally liable for the knowledge and acts of their agents and employees, who the evidence shows, while acting in the course of their employment, actually made the sales without having collected the required down payment.

■ The appellants excepted to the instructions of the court charging one partner with the knowledge of the other and both partners with the knowledge and the acts of their agents and employees as "being sufficient to supply the necessary scienter and knowledge required in a criminal case." The appellants did not further state the grounds of their objection, and it may be seriously questioned whether this exception is sufficiently specific to meet the requirements of Fed.Rules Cr.Proc. Rule 30, 18 U.S.C.A., which provides that no party may assign as error any portion of a charge or omission therefrom unless he distinctly states the matter to which he objects and the grounds of his objection. See Nabob Oil Co. v. United States, 10 Cir., 190 F.2d 478. But in view of the fundamental nature of the question posed by the instruction, we think we should notice it *sua sponte*. Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330; Mondshine v. Short, 5 Cir., 196 F.2d 606; Tatum v. United States, 88 U.S.App.D.C. 386, 190 F.2d 612; Apodaca v. United States, 10 Cir., 188 F.2d 932. The effect of the challenged instruction is said to apply the doctrine of respondeat superior

sometimes applicable to fix civil tort liability but inapplicable to establish criminal guilt or liability.

■ Deeply rooted in our criminal jurisprudence is the notion that criminal guilt is personal to the accused; that wilfulness or a guilty mind is an essential ingredient of a punishable offense, and that one cannot intend an act in which he did not consciously participate, acquiesce, or have guilty knowledge. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; Sayre, Criminal Responsibility for Acts of Another, 43 Harvard Law Review 689, March, 1930; Horigan, Criminal Liability of Master for Acts of Servant, Vol. 1, No. 1, Oklahoma Law Review, page 52; 35 Am.Jur., Master and Servant, § 601, page 1041. In other words, crime results "only from concurrence of an evil-meaning mind with an evil-doing hand". See Morissette v. United States, supra, 342 U.S. at page 251, 72 S.Ct. 244.

Amenable to this notion, the courts have been reluctant to hold the master or the employer criminally responsible for the acts of his agent or employee which he did not authorize, counsel, advise, approve or ratify.

It is only in the so-called public welfare offenses usually involving police regulation of food, drink and drugs that the courts have relaxed the necessity for proof of a wilful intent. In most of those cases the legislature has deliberately eliminated wilfulness as an essential element of the offense by prohibiting and punishing the doing of the act whether by the principal or his agent. See United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619; United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604; United States v. Kaadt, 7 Cir., 171 F.2d 600; United States v. Parfait Powder Puff Co., 7 Cir., 163 F.2d 1008; Sayre, Public Welfare Offenses, 33 Columbia Law Rev., page 55; U. S. v. Greenbaum, 3 Cir., 138 F.2d 437, 152 A.L.R. 755; Hershorn v. People, 108 Colo. 43, 113 P.2d 680, 139 A.L.R. 306. "In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." United States v. Dotterweich, 320 U.S. 277, 281, 64 S.Ct. 134, 136, 88 L.Ed. 48. In some cases the statutes with which the courts were concerned specifically made the principal liable for the acts of his agent. See New York Central & Hudson R. R. Co. v. United States, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613; Ex parte Marley, 29 Cal.2d 525, 175 P.2d 832.

■■ In our case wilfulness is specifically made a prerequisite to guilt. Indeed, it is the gist of the offenses charged in all of the counts in the information. And the trial court instructed the jury that in every crime or public offense there must be a "union or joint operation of act and intent" but "that the intent or intention is manifest by the circumstances connected with the offense as well as by direct testimony."

What the court did in effect was to make wilfulness an essential element of the offenses charged in the information, and to charge the employers with the guilty knowledge and acts of the employees in determining the question of wilfulness. In so doing, it had recent precedent in this court. In Inland Freight Lines v. United States, 10 Cir., 191 F.2d 313, the defendant was charged with the wilful violation of a regulatory statute in keeping and preserving false records of which it had knowledge only through its agents and employees. In determining the question of wilfulness the defendant was charged with the knowledge of its employees, and we reversed only because the jury was permitted to infer wilfulness from mere negligence on the part of the employer in failing to investigate the integrity of records which it was charged with the duty of preparing and keeping. See also Inland Freight Lines v. United States, 10 Cir., 202 F.2d 169.

The effect of this is not to dispense with wilfulness or guilty knowledge as an element of the offense. It is to charge the employer with knowledge of records he is required to keep and acts he is required or forbidden to do, and which he necessarily keeps, does or omits to do by and through his agents and employees. To be sure, the knowledge with which he is charged is not

direct; it is constructive. If it be called vicarious responsibility, it is nevertheless a responsibility of him on whom the law places the duty. It is permissible proof of a wilfulness which in its proper context denotes more than mere negligence but less than bad purpose or evil motive. It connotes a course of conduct which may be construed by the triers of fact as deliberate and voluntary, hence intentional; or it may be construed as negligent, inadvertent and excusable. The act or omission itself is not inexorably penalized. The ultimate question of guilt is left to the ameliorating influence of those who sit in judgment. Considered in this light, we do not think the instructions of the court fall short of the traditional standards for guilt.

As we read count three of the information, it is intended to charge a specific violation of Section 6(i) of Regulation W, supra, which forbids an extension of credit knowing that other credit in connection with an installment sale has been extended so that the total amount of credit would exceed 75% of the sale price of the article sold, and the section goes on to provide that "if the Registrant accepts in good faith a written statement signed by the obligor that no such other credit exists, or is to be extended, such statement shall be deemed to be correct for the purposes of the Registrant." The appellants Gordon and Tempkin requested the court to read the quoted part of that section to the jury, contending that the sales contract in both the Colley and Allen transactions showed a down payment of the required 75% and that Gordon relied upon the contract and the bank records to show a statement within the exculpatory provisions of the Section.

█ Conceding that the conditional sales contract and the other company records were bona fide and that as such they showed the collection of the full down payment, they did not constitute the good faith acceptance of a written statement signed by the obligor as contemplated by Section 6(i). We think the trial court properly refused the instruction.

The appellants also complain of the prejudicial remarks and rulings of the court during the course of the trial which prevented them from having a fair and impartial trial. While the presiding judge did take an active interest in the trial, interrogating witnesses and making comments from time to time, a careful check of the entire record fails to indicate that the acts of the court prevented the defendants from having a fair trial.

The judgment as to Deverich and Stone is reversed. In all other respects it is affirmed.

HUXMAN, Circuit Judge (dissenting).

As stated in the majority opinion, wilfulness is an element of the offense under the applicable statute and regulations promulgated thereunder. Counts one and three charged that the two partners and two of their employees wilfully violated the statute and regulations by making two sales on credit and receiving less than the mandatory twenty-five per cent down payment. Count two charged a wilful failure to keep correct records. Count two is so described by the trial court in its instructions, although in a subsequent instruction the court informed the jury that "those first three counts, in brief, charge that the defendants extended a greater amount of credit on the installment sale of a sewing machine than was permitted under the Defense Production Act."

While counts one and three charged the partners, Gordon and Tempkin, together with two employees, with having made the sale set out therein, no attempt was made to prove and there is no evidence in the record that the partners actively participated in the sales. The Government's entire effort was directed to establishing that they had guilty knowledge of the unlawful activities and acquiesced therein. If the only question before us was a sufficiency of the evidence to sustain the verdict and judgment of guilt based thereon, the answer would be simple. The evidence is sufficient to sustain a conclusion that the partners had reason to know that the regulations were being violated by their employees. But while it is important that the guilty be brought to trial and speedily

punished, it is even more important to the preservation of our institutions that due process be observed in bringing that about. Due process means that the trial must be conducted according to recognized principles of law and procedure. It requires an impartial trial. It is necessary that only competent evidence be received and that the jury be correctly instructed as to the basic principles of law, guiding it in its deliberations and considerations of the evidence in the case. The partners denied intent to violate the law or any knowledge that their employees were violating it. They were entitled to have their testimony weighed and evaluated under proper instructions by the court together with all other relevant evidence. They were entitled to have the jury told that they were not criminally liable for the acts of their employees, although committed within the scope of their employment, unless they directed such activities or had guilty knowledge thereof. It is a principle embedded in the English law from time immemorial that the sins of the father shall not be visited upon the son merely because the father is the agent of the son and his unlawful acts were committed within the scope of his employment, under a criminal statute making wilfulness an element of the offense when the son had no knowledge of or part in such violations.

It would be an onerous burden to cite, let alone analyze, all the cases that have announced and adhered without deviation to this basic principle of law. Reference will be made only to some of the cases which have held that a partner is not liable for the criminal acts of another partner or of an employee in which he has not participated or of which he had no guilty knowledge. A good statement of the law is found in United States v. Cohn, C.C., 128 F. 615, 623, as follows: "It is a rule in criminal cases that a partner is not charged by the criminal acts of his copartners, or others acting in behalf of the firm, unless he has knowledge thereof. The law in relation to partnership is that the partner agrees to be bound for all acts done in obedience to the law, to which there are attached certain civil liabilities for fraudulent acts or representations done or made by a partner or an agent for the purpose of affecting the firm's business. It is not considered that, in the absence of some special statute bearing upon the particular acts of a firm, whereby each partner is made the subject of punishment, one partner can be found guilty of a crime because his partner or agent has done acts that would justify his or their punishment." [1]

Strong reliance is placed upon Inland Freight Lines v. United States, 191 F.2d 313, by this court. But that case is clearly distinguishable. There the sole defendant was the corporation charged with keeping false records and it was held that the knowledge of its agents was the knowledge of the corporation. That is the well established principle of criminal law as applied in the case of a corporation. It is, as the law recognizes, the only way a corporation can be held criminally responsible for violations of penal statutes. While a corporation is recognized as a separate legal entity, such separate entity is a pure fiction of the law. As a separate entity and aside from its agents and employees a corporation can do nothing. It has no conscience, will, or power of thought. It acts only through its agents. Their acts are the only acts it can commit and their knowledge of necessity is the only knowledge it can have.[2]

The only cases in which a principal without actual intent or knowledge of criminal acts of wrong-doing by his employees has been held criminally responsible for such acts arose under welfare statutes such as the Pure Food and Drug Laws, Liquor Laws and Weight and Measure Acts. But under all of these acts where a principal

1. To the same effect see Williams v. Hendricks, 115 Ala. 277, 22 So. 439, 41 L.R. A. 650; Levin v. United States, 9 Cir., 5 F.2d 598; Sleight v. United States, 65 App.D.C. 203, 82 F.2d 459.

2. Burdick, Law of Crime, Sections 175, 178 and 179; Bishop, New Criminal Law, Section 417; Kunz v. Lowden, 10 Cir., 124 F.2d 911; Haverty Furniture Co. v. Foust, 174 Tenn. 203, 124 S.W.2d 694, 695.

was held guilty because of the acts of his agents without knowledge or intent on his part wilfulness was not an element of the offense and the statute made the doing of the act the offense.[3]

Instead of telling the jury that the partner appellants would be liable for the acts of their agents committed within the scope of their employment only if they directed the same or had guilty knowledge thereof and consented thereto, the court instructed the jury that it was sufficient to establish the guilt of the partners that the agents committed these unlawful acts in the course of their employment because such acts by the agents would be the acts of the principal. In calling the jury's attention to the charge in count one, the court told the jury "Now if an agent or employee of Mr. Gordon or Mr. Tempkin, as I have said to you, acting within the course of his employment, makes an installment sale of a sewing machine, the act of that agent is the act of the master and of the employer." It also told the jury that "the knowledge of a partner is chargeable to the other partner, and the knowledge of an agent or a servant is chargeable to the employer."

"Now that is true, ladies and gentlemen of the jury, only if the agents or employees are engaged in the course of and within the scope of their employment, and only if the knowledge comes to them while they are so engaged, but if they obtain knowledge while they are engaged in the course of the business working for their employer, that kind of knowledge is imputable,—attributable and chargeable to the employer." The court thus applied the civil rule of liability in a criminal case. I can find no case which has applied this rule to criminal prosecutions.

This error was in my opinion not overcome by the court's subsequent statement that "it is not necessary to have direct evidence of knowledge, or direct evidence of wilfulness, or direct evidence of any of the acts in this Information charged. You are instructed that you may find the elements of these offenses, if you so find,

upon inferences, upon conclusions, upon presumptions which under the facts and circumstances of the case, and all of them, are reasonably to be drawn." In addition to the two partner defendants, two employees also were defendants. As to them it was equally necessary to prove the elements of wilfulness and intent to commit the unlawful acts charged against them. Having previously and in unmistakable language told the jury that it was not necessary to find knowledge or. intent on the part of the partners if the acts of these other two defendants were committed in the course of their employment, the jury of necessity must have been led to conclude that this instruction related to the burden of proof of the element of knowledge and intent on the part of the two employees. This was the theory upon which the case was tried. The jury was not asked to determine, or was not told, that it was necessary to find that the partners had knowledge or intent that the law was being violated. As stated in the majority opinion, as to them the case was tried and submitted upon the theory of imputable knowledge, that is, if the acts of the agent were committed in the course of their employment, the partners would be guilty without actual knowledge or intent on their part to violate the law.

Appellants excepted to the challenged instructions in the following language:

"Except to the court's instructions as to the knowledge of the defendants through employees, the knowledge of a partner being charged to the other partner if the knowledge is obtained while the employee is engaged in the scope of his employment, or to similar effect."

"Further object and except to the instruction with respect to the act of an agent being the act of the employer as being sufficient to supply the necessary scienter and knowledge required in a criminal case."

This could leave no doubt in the minds of anyone as to the particular instructions

---

**3.** Ex parte Casperson, 69 Cal.App.2d 441, 159 P.2d 88; Ex parte Marley, 29 Cal.2d 525, 175 P.2d 832.

which were being challenged or as to the objection with respect thereto.

For the above reasons I find myself unable to concur in the conclusions of my Associates and would reverse the judgment.